HENRY W. SAGE, Appellant, v. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondent.

1. NEW YORK CITY — COLONIAL RIPARIAN GRANT. The grant made by Governor Nichols in 1667, conveying to the inhabitants and freeholders of the village of New Harlaem, on Manhattan island, certain lands bounded therein by the Harlem river, conveyed only to high-water mark; and, hence, the grantees took title to the uplands only, and became simply riparian proprietors upon navigable tidewater.

2. PUBLIC IMPROVEMENTS — RIPARIAN OWNERS. As against the general public, through their official representatives, riparian owners have no right to prevent important public improvements upon tidewater.

3. IMPROVEMENT OF WATER FRONT. The city of New York has absolute power to improve the water front of Manhattan island for the benefit of navigation, free from any interference by the riparian owner, whose sole right against the state or its municipal grantee, as the trustee for the public, is the pre-emptive right to purchase, in case of sale, when conferred by statute.

4. GRANT OF RIPARIAN LANDS — IMPLIED RESERVATION. In every grant of lands bounded by navigable tidewaters, made by the crown or the state as trustee for the public, there is reserved by implication the right to so improve the water front as to aid navigation for the benefit of the general public, without compensation to the riparian owner.

5. COLONIAL CHARTERS. The Dongan and Montgomerie charters, ratified and confirmed by the State Constitution of 1777, vested in the city of New York the absolute title to all the surrounding land between high and low-water mark.

6. TITLE TO MADE LAND. Land made by the city of New York in rightfully filling up the water front and constructing piers, under its ancient charters and subsequent constitutional legislation, does not become the property of the riparian owner through the doctrine of accretion, but remains the property of the city for the benefit of the public.

7. SUBORDINATION OF RIPARIAN RIGHTS. The riparian rights of an owner of Harlem upland are subordinate to the right of the city of New York, under its ancient charters supplemented by constitutional legislation and state grants, to fill in and make improvements, such as an exterior street, docks and bulkheads, from the high-water mark in front of his upland to and below low-water mark, essential to navigation and commerce, without compensation.

*Sage* v. *Mayor*, 10 App. Div. 294, affirmed.

(Argued June 9, 1897; decided October 12, 1897.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered December 8, 1896, affirming a judgment in favor of defendant entered upon a decision of the court at Special Term dismissing the complaint.

The plaintiff, as the owner of a parcel of land lying between 94th and 95th streets on the Harlem river, which is a navigable stream where the tide regularly ebbs and flows, traces his title back to a grant made by Governor Nichols on the 11th of October, 1667, whereby he conveyed to the inhabitants and freeholders of the village of New Harlaem certain lands bounded on one side by the "Harlem River or any part of the said river on which this island," (of Manhattan), "doth abut * * * together with all the soils, creeks, quarries, woods, meadows, pastures, marshes, waters, lakes, fishing, hawking, hunting and fowling and all other profits, commodities, emoluments and other hereditaments belonging to the

said lands and premises within the said bounds and limits set forth, belonging or in anywise appertaining." Said grant was confirmed by Governor Dongan on the 7th of March, 1686, and under this title by an unbroken series of conveyances the plaintiff, on the first of October, 1861, became seized and possessed of all the premises in question, so far as they consist of uplands or lands which, in a state of nature, were above water. By virtue of this title he also claims all the rights and easements which ordinarily belong to a riparian owner of lands bounded by a navigable river, in which the tide ebbs and flows. He further claims to have acquired, from the same source, title to the tideway, and for some distance into the stream beyond.

The city of New York claims title to the land formerly under water, which used to lie between high and low-water mark in front of the uplands belonging to the plaintiff, by virtue of a grant made by Governor Dongan on the 26th of April, 1686, whereby he conveyed to the mayor, aldermen and commonalty of the city of New York, "All the waste, vacant, unpatented and unappropriated lands lying and being within the said city of New York and on Manhattan island aforesaid, extending and reaching to the low-water mark in, by and through all parts of the said city of New York and Manhattan island aforesaid, together with all rivers, rivulets, coves, creeks, ponds, water and watercourses in the said city and island, or either of them," except such portion as had been previously conveyed. Said grant provided that the grantees might, "at any time or times hereafter, when it to them shall seem fit and convenient, take in, fill and make up and lay out all and singular the lands and grounds in and about the said city and Island Manhattans, and the same to build upon, or make use of, in any other manner or way as to them shall seem fit as far into the rivers thereof, or that encompass the same as low-water mark aforesaid." This grant was confirmed by Governor Montgomerie on the 15th of January, 1730, as well as by an act of the colonial legislature passed on the 14th of October, 1732 (L. 1732, ch. 584), which, in turn, was con-

firmed by the first Constitution of the state. (§ 35.) By chapter 50 of the Laws of 1775, the division of the township of Harlem from the city of New York specifically left the tideway in the latter.

The city of New York further claims title to the lands under water in front of, and outside of, the tideway and extending into the river for a considerable distance, by virtue of certain grants from the state. By chapter 285 of the Laws of 1852, the city was authorized to lay out an exterior street along the Harlem river, and the title of the People was thereby conveyed to the city "in and to lands under water from low-water mark to and including the said exterior street," subject to a pre-emptive right to purchase by the adjacent owner in case of a sale by the city.

Pursuant to chapter 763 of the Laws of 1857, a bulkhead line or line of solid filling and pier line was established in the Harlem river, outside the line of low-water mark, and subsequently, under the provisions of chapter 574 of the Laws of 1871, the state, through the commissioners of the land office, conveyed to the city lands under water in said river out to a line parallel with and three hundred feet outside of the bulkhead line so established. The city claims that, pursuant to said grants and statutes, it has become lawfully seized, and that it now owns in fee all the lands under water in front of the plaintiff's upland as far out into the river as the exterior line above mentioned. In 1887, a plan for the permanent improvement of the water front of the Harlem river between 94th and 95th streets and the adjacent neighborhood was determined upon and adopted by the commissioners of docks and approved by the commissioners of the sinking fund pursuant to chapter 517 of the Laws of 1884. The defendants, conforming to said plan, are now building a sea wall along the waters of the Harlem river beyond the line of low-water mark between 94th and 95th streets, and are filling in behind said wall and expending thereon large sums of money. They intend to continue and complete the wall in conformity to said plan.

The premises claimed by the plaintiff consist in part of lands made entirely out of the Harlem river and in part of lands still under water, all of which, at the date of the Nichols patent in 1667, was either between high and low-water mark or else was land under water out in that stream beyond the tideway. The filling in of this land was done pursuant to said legislation for the improvement of the water front of the city of New York, and is in accordance with the plan adopted by the dock department. The outer portion of said improvement consists of bulkheads, docks and piers, traversed by a marginal street 125 feet wide, running parallel with the river and situate below the old low-water mark. Between said marginal street and plaintiff's uplands there is a piece of filled-in land, comprising part of the block lying between 94th and 95th streets, which is not appropriated by said plan and improvement to any public use. No proceedings have been taken to acquire any property or rights of the plaintiff, nor has compensation been made to him or provided for his benefit. The main issue, according to the pleadings and the facts agreed upon by the parties, relates to the title to these constructed premises, being the bulkhead, docks and piers, the lands covered by the marginal street, and those unappropriated to public use, all of which the plaintiff claims under the Nichols charter, while the defendants claim the same under the Dongan and Montgomerie charters, and the various acts of the colonial and state legislatures relating to the subject, as confirmed by the Constitution of 1777. According to the deeds constituting the chain of plaintiff's title to the upland, the grants ran to high-water mark until 1852, when a conveyance running to low-water mark was given, and in 1861, when the plaintiff took title, his conveyance purported to cover the lands under water as far out as the bulkhead line established by the harbor commissioners. No claim is made that the plaintiff, as owner of the upland, has applied to the sinking fund commissioners for any grant of the land in controversy.

Upon these facts, which were stipulated, the plaintiff asked at the trial, the demand in the complaint being somewhat

broader, that the defendants should be restrained from using said docks and bulkheads and the lands covered by the marginal street until compensation should be made to him therefor, and that he be adjudged to have title in fee simple absolute to the intermediate piece of land lying between the marginal street and his upland not appropriated by the plans of the defendant, or the statutes of the state, to any public use.

The Special Term dismissed the complaint, holding that the title of the plaintiff under the ancient grants ran only to high-water mark; that his riparian rights as owner of the uplands were subordinate to the right of the public authorities to build thereon and make improvements below low-water mark essential to navigation and commerce without compensation, and that the acts of the defendant were not unlawful.

The judgment entered upon the decision of the trial court was affirmed by the Appellate Division, one of the learned justices dissenting (10 App. Div. 294), and the plaintiff now comes here.

*William C. De Witt* for appellant. The title of the plaintiff vested in him all the rights and easements upon the river incident to riparian ownership under the most favorable circumstances. (*Hedges* v. *W. S. R. R. Co.*, 150 N. Y. 156; *Van Dolsen* v. *Mayor, etc.*, 21 Blatchf. 455; *Mayor, etc.*, v. *Hart*, 95 N. Y. 457.) The mayor, aldermen and commonalty of the city of New York in the construction of streets, wharves, docks and piers upon the tideway granted to them by the Dongan and Montgomerie charters are bound in law to compensate riparian owners for all damages thereby inflicted upon their estates. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75; *Buccleuch* v. *M. Bd. of Works*, L. R. [5 E. & I. App.] 418; *St. Louis* v. *Rutz*, 138 U. S. 246; *Kane* v. *N. Y. E. R. R. Co.*, 125 N. Y. 184; *Ashby* v. *Eastern R. R. Co.*, 5 Metc. 368; *S. E. Co.* v. *Steamship Co.*, 12 R. I. 348; *Chapman* v. *O. & M. R. R. Co.*, 33 Wis. 629; *Delaplaine* v. *C. & N. W. R. Co.*, 42 Wis. 214; *Holton* v. *Milwaukee,*

31 Wis. 38; *Brisbine* v. *S. P. & S. C. R. R. Co.*, 23 Minn. 114.) The construction of the marginal street, constituting the second class of land erected out of the water, cannot, by any sound construction, be included in the water grants contained in the Dongan and Montgomerie charters, which must be in law, as they are in terms, confined to commercial uses; and the act of the legislature authorizing the construction of this street is subject to the constitutional provisions requiring compensation to be made where private property is taken or where damages are inflicted upon private rights. (*Bedlow* v. *N. Y. F. D. D. Co.*, 112 N. Y. 274; *Smith* v. *City of Rochester*, 92 N. Y. 477; *Ledyard* v. *Ten Eyck*, 36 Barb. 102.) The intermediate piece of land unappropriated to any public use, lying between the interior line of the marginal street and the upland banks of the riparian owner with which it is actually intermingled, is to be treated as alluvion or reliction or accession, and has become in law and equity the property of the plaintiff. (*St. Clair County* v. *Lovingston*, 23 Wall. 66; *New Orleans* v. *United States*, 10 Pet. 662; *Saulet* v. *Shepherd*, 4 Wall. 502; *Schools* v. *Risley*, 10 Wall. 110; *King* v. *Yarborough*, 3 D. & C. 178; *Steers* v. *City of Brooklyn*, 101 N. Y. 56; *Ledyard* v. *Ten Eyck*, 36 Barb. 102; Gould on Waters, 314, § 155; *Adams* v. *Frothingham*, 3 Mass. 362; *Halsey* v. *McCormick*, 18 N. Y. 147; 3 Washb. on Real Prop. 65; *Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522.) The defendant having mapped, taxed and assessed the unappropriated lands as the property of the plaintiff and not the property of the city, and especially having, by judicial procedure, caused said lands to be assessed for moneys to be devoted to the purchase of lands for parks and streets, to be owned by it in fee simple, and having collected such taxes and assessments from the plaintiff, and, furthermore, having sold to the plaintiff the said land by a good and sufficient deed of conveyance in the form of a lease for 1,000 years, given in writing for an adequate consideration, the title to said lands must be adjudged in the plaintiff, as against the defendant, and the defendant is estopped from claiming the same.

(*Dunham* v. *Townshend*, 43 Hun, 580; 118 N. Y. 287; *Embury* v. *Conner*, 3 N. Y. 511; *Sherman* v. *McKeon*, 38 N. Y. 274; *Bartholomew* v. *Finnemore*, 17 Barb. 428.)

*Francis M. Scott* for respondent. The land in the tideway is owned in fee absolute by the defendant. (Dongan charter of 1686, § 3; *Towle* v. *Remsen*, 70 N. Y. 303; *Furman* v. *Mayor, etc.*, 5 Sandf. 16; 10 N. Y. 568; *Mayor, etc.*, v. *Hart*, 95 N. Y. 443; *Mayor, etc.*, v. *Mott*, 60 Hun, 423.) The land in question belonging to the city is subject to no easement. (4 Coke Inst. 36; 1 Black. Comm. 90, 160, 161, 224; *Comm.* v. *Alger*, 7 Cush. 53; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129, 155; Gould on Waters, § 21; L. 1732, ch. 584; Const. of 1777, §§ 35, 36.) The contention of the plaintiff that the grant to the inhabitants of Harlem being prior in time to the Montgomerie charter, therefore, plaintiff, holding under that grant, is entitled to some rights superior to those of the city in the tideway and land under water now in question is untenable. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *Mayor, etc.*, v. *Hart*, 95 N. Y. 450; Gould on Waters [2d ed.], §§ 4, 19; *People ex rel.* v. *Jones*, 112 N. Y. 606; *N. Y. C. & H. R. R. R. Co.* v. *Aldridge*, 135 N. Y. 83; Gould on Waters [2d ed.], § 23.) Plaintiff has no claim based on accretion. (*Mulry* v. *Norton*, 100 N. Y. 424; *Halsey* v. *McCormick*, 18 N. Y. 147; *Blakeslee M. Co.* v. *B. S. I. Works*, 129 N. Y. 155; *N. Y. C. & H. R. R. R. Co.* v. *Aldridge*, 135 N. Y. 83.) The city's title to all the filled-in land between the bulkhead, as it was established under the act of 1852, and the present line of filling, has been the settled law since 1861, but if any property rights of the plaintiff have been destroyed, his only remedy is at common law for trespass. (*Van Zandt* v. *Mayor, etc.*, 8 Bosw. 375; *Williams* v. *Mayor, etc.*, 105 N. Y. 420; *Langdon* v. *Mayor, etc.*, 28 Hun, 170; 93 N. Y. 129; *Kingsland* v. *Mayor, etc.*, 110 N. Y. 569; *Green* v. *N. Y. C. & H. R. R. R. Co.*, 65 How. Pr. 160.) The taxes and tax sales by the city's officers do not

estop the city from claiming title. (*Mayor, etc.,* v. *Law,* 125 N. Y. 380 ; *Rossire* v. *City of Boston,* 4 Allen, 57 ; *City of St. Louis* v. *Gorman,* 22 Mo. 593 ; *McFarlane* v. *Kerr,* 10 Bosw. 249 ; *Elsworth* v. *Grand Rapids,* 27 Mich. 250 ; *People ex rel.* v. *Cassity,* 46 N. Y. 46 ; *Smith* v. *Mayor, etc.,* 68 N. Y. 552 ; *People ex rel.* v. *Comrs. of Taxes,* 82 N. Y. 459 ; *People ex rel.* v. *Board of Assrs.,* 93 N. Y. 308 ; *Baker* v. *U. M. L. I. Co.,* 43 N. Y. 283 ; *Boardman* v. *L. S. & M. S. R. Co.,* 84 N. Y. 157 ; *N. Y. & Oswego M. R. R. Co.* v. *Van Horn,* 57 N. Y. 473 ; *Shapley* v. *Abbott,* 42 N. Y. 443 ; Bigelow on Estoppel [5th ed.], 626, 627.)

VANN, J. The lands granted by Governor Nichols to the inhabitants of the village of New Harlem were bounded on the east by the Harlem river, which was made by specific mention the limit of the conveyance in that direction. After the lands intended to be conveyed had been thus definitely bounded in the deed, a clause followed which, in the profuse language of ancient documents, described the appurtenances so fully as to give rise to the claim now made that the boundaries of the grant itself were enlarged thereby. As the western shore of the river below high-water mark consisted largely of " meadows, pastures and marshes," it is argued that by including those words, with many others, in the description of the appurtenances, it was intended to include the meadows, pastures and marshes adjoining the bank of the river as a part of the grant. Whatever force the argument might otherwise have, it completely fails in this instance, because the long description of appurtenances is ended and limited by the words " within the said bounds and limits set forth," thus making it clear that there was no intention to push the bounds of the grant out into the river or to extend them beyond its western bank.

When lands are described in a deed as bounded by a navigable river where the tide ebbs and flows, the title ends at high-water mark, as the law stood at the date of the Nichols charter and as it stands to-day. (*Mayor* v. *Hart,* 95 N. Y.

443; *Wheeler* v. *Spinola*, 54 N. Y. 377, 385; *Roberts* v. *Baumgarten*, 110 N. Y. 380; *Barney* v. *Keokuk*, 94 U. S. 324, 336; Hale's De Jure Maris, 96; Moore's Foreshore and Seashore, 782; 2 Blacks. Com. 347; Comyn's Dig. title Grant, G., 7, 12; Devlin on Deeds, § 1028; Gerard's Title to Real Estate, 851; Gould on Waters, § 175; 3 Kent's Com. 427, 432; 4 Am. & Eng. Encyc. of Law [2nd ed.] 820.) The grantees in that instrument, therefore, took title to the uplands lying upon the river, but not to the tideway or to any land below high-water mark. In other words, they became simply riparian proprietors upon tide water, with such title, rights and privileges only as belong at common law to the owners of upland washed by waters where the tide ebbs and flows. While the title of such owners did not extend beyond the dry land, they were entitled, as against all but the crown as trustee for the people at large, to certain valuable privileges or easements, including the right of access to the navigable part of the river in front for the purpose of loading and unloading boats, drawing nets and the like. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75, 87; Angell on Tidewater, 22, 64.) These riparian rights were property belonging to the riparian owner, who could not be deprived of them without his consent, or by due process of law, although he could only use them subject to the rights of the public. The title to the tideway and to the land beyond continued in the English crown, as a public trust, after the Nichols charter the same as before for nearly twenty years, and until the year 1686 when Governor Dongan granted to the city of New York all the land between high and low-water mark, and his grant was subsequently confirmed by Governor Montgomerie, by the colonial legislature and by the first Constitution. The title to the remaining lands now in controversy, still farther out in the river, continued in the crown as a prerogative right until by the Revolution and the treaty of peace between the colonies and England it passed to the state of New York, which subsequently, by various legislative acts and proceedings had

thereunder, granted it to the city of New York. (*Martin v. Waddell,* 16 Peters, 367.) As all of these grants were made after the date of the Nichols charter, according to the general rule, they could have no effect upon the riparian rights of the grantees named therein, or of their successors in title, as that would violate vested rights by taking away property from one and giving it to another without due process of law. Whatever the common law may have been prior to *Magna Charta,* after the date of that venerable instrument, even the king of England could not grant to one subject that which he had already lawfully granted to another. While the English Parliament, being restrained by no constitution that it cannot override if it so wills, can take the property of an individual for public use without making compensation, it is not claimed that any of the grants under consideration were made pursuant to an act of Parliament. As the colonial governors and legislatures derived their powers from the crown, they could not interfere with private property any more than the crown itself. (*Martin v. Waddell, supra ; Johnson v. M'Intosh,* 8 Wheat. 595.) But while the general rule prevents any disturbance of riparian rights by public authority, past or present, without making compensation, when the interest of the whole people requires an improvement of the water front for the benefit of navigation and commerce, it seems to have been the rule for the state, or the city of New York by permission of the state, to make such improvements upon the tidewater front for that purpose, without compensating the riparian proprietor, other than by giving him the pre-emptive right of purchasing in case of a sale. The foundation of the rule does not seem to have been clearly pointed out, although a review of the authorities demonstrates its existence.

In *Lansing* v. *Smith* (4 Wend. 9) it was held by the Court of Errors that the owner of lands adjacent to the shore of the Hudson river at Albany, who had erected a wharf upon the same after a grant of land under water from the commissioners of the land office, could not maintain an action on the

case against those to whom subsequently the legislature gave the privilege of erecting a pier in the river for the purpose of constructing a basin to protect boats, although such pier entirely encompassed the wharf on the side of the water so as to leave no communication between it and the river, except through a sloop lock at one extremity of the basin, and although the privileges of the owner of the wharf were materially impaired by the construction of the pier. The court declared his loss to be *damnum absque injuria*, and that the grant of the right to erect a wharf implies a reservation to the legislature of the right to regulate the use of it and of the adjacent waters. It was further held that the grant of the right to erect the pier, although subsequent to the former grant, did not violate that provision of the Constitution of the United States which provides that no state shall pass a law impairing the obligation of a contract, nor that provision of the Constitution of this state declaring that private property shall not be taken for public use without just compensation, and that the first grant did not preclude the legislature from making a great public improvement for the benefit of commerce without compensating the adjoining owner.

In *Furman* v. *Mayor, etc., of New York* the facts are imperfectly stated and the decision very meagre as reported in 10 N. Y. 567, but both are very full as reported in 5 Sandf. 16. In that case the legislature authorized the city of New York to lay out streets and wharves 70 feet wide in front of the East and Hudson rivers, and provided that they should be built according to a plan adopted by the city, by and at the expense of the owners of the land adjoining, in proportion to the breadth of their several ·lots, and that upon filling up and levelling the lands under water in front of their uplands to the extent provided, they should become the owners of the made ground in fee simple, and entitled to the cranage and wharfage. After compliance by the owner and a conveyance to him from the city of the new land thus made by wharfing out, the city, under authority from the legislature, tendered to him a grant of the land under water for a certain distance still

farther out into the stream in front of his premises, with notice that if he refused to accept it at a certain valuation the said land would be granted to any person willing to take it. The statute under which this action was taken provided that after such a grant the grantee should build streets and wharves covering the land under water embraced in the grant. A bill was filed by the owner of the upland and of the made lands under the first grant to restrain the city from making the proposed second grant, but it was dismissed on the merits at the Special Term, and the judgment was affirmed at the General Term and by the Court of Appeals.

Upon the argument of the appeal the point was distinctly made that the plaintiff, as a riparian owner, had the right of ingress and egress to his water front; that the proposed action of the city would be an invasion of the rights of private property, and that he could not be deprived of that property without adequate compensation.

In *People* v. *N. Y. & S. I. Ferry Co.* (68 N. Y. 71) it was held that public grants to individuals, under which rights are claimed in impairment of public interests, are to be construed strictly against the grantee, who, although he can exclude all individuals from the permanent occupation of lands under tidewater held by him under such grant, cannot exclude the state, which still has the right to regulate the use of the premises in the interest of the public and for the protection of commerce and navigation. The court said : " Gore was the owner of the upland adjoining the lands under water embraced in the grant. The ownership of the adjacent upland, however, gave him no title to or interest in the lands under water in front of his premises. The title to lands under tidewaters, within the realm of England, were, by the common law, deemed to be vested in the king as a public trust, to subserve and protect the public right to use them as common highways for commerce, trade and intercourse. The king, by virtue of his proprietary interest, could grant the soil, so that it should become private property, but his grant was subject to the paramount right of public use of navigable

10

waters, which he could neither destroy or abridge. In every such grant there was an implied reservation of the public right.   *   *   * "

In *Towle* v. *Remsen* (70 N. Y. 303) it appeared that the city of New York, prior to 1807, had title to the tideway, and in that year the state granted it land under water in front of the tideway, with a proviso giving the pre-emptive right to the owners of adjacent lands in all grants made by the city of lands under water. In 1837 the city granted to one who claimed to be the owner of the upland the water lots in front, consisting partly of the tideway and partly of land below low-water mark, reserving certain rents payable annually and with a condition that if it should appear at any time that the grantee was not seized of an estate in fee simple of the adjoining land above high-water mark the grant should be void. The grantee did not in fact own the upland, and when this was established by litigation, the commissioners of the sinking fund canceled said grant, and in 1859 gave the plaintiff a conveyance of the same lots upon payment of the back rent. In an action of ejectment brought by the second grantee against the first, who had in the meantime constructed bulk-heads and streets, the complaint was dismissed and the judgment of dismissal was affirmed by this court, which held that the city by accepting title to lands beyond the tideway with said proviso, did not consent to qualify its title to the tideway so that it could thereafter only grant land therein to the persons to whom it could grant the adjoining lands under water. It was further held that under the Dongan and Montgomerie charters the city had an absolute fee to the tideway and could grant it to any one that it chose, regardless of the wishes of the owner of the upland.

In *Mayor* v. *Hart* (95 N. Y. 443) the question to be decided was whether the owners of the uplands situated on the Harlem river in the former village of Harlem had an equitable claim to priority of purchase of lands under water in front of their premises in case the city sold the same, but incidentally the title to the tideway and the effect of the Nichols, Dongan and

Montgomerie charters was involved. The court held that the Nichols charter conveyed only to high-water mark, and that by the Dongan charter the city of New York acquired title to the tideway on the whole circuit of Manhattan island and held it as an absolute fee. By an interesting historical argument the court showed that Harlem was established as a village within the general limits of the city itself for the promotion of agriculture, and the recreation and amusement of the city of New Amsterdam, and drew the inference from the surrounding circumstances that the Nichols grant should receive a limited construction. In the language of Judge FINCH, who prepared the opinion: " The city was to be the seaport, and for this purpose its water front was to girdle the island, while the village was meant for a rustic hamlet, whose inhabitants should own cattle rather than ships. Without pursuing the subject in its details it is enough to say that we have discovered no adequate reason for straying from the general rule in construing the Harlem patents, and are satisfied that the river line was at high-water mark, and so the city owned the tideway. Its title to so much of the lands in dispute as constituted the portion of the tideway adjacent to and in front of the upland owned by the defendants was thus established. That title in its origin was absolute. The city could sell the strip to whom it pleased, and it was unburdened with any pre-emptive privilege amounting to a legal right in any one." After referring to the pre-emptive right given by statute to owners under grants theretofore made by the city of lands beyond the tideway and to the equitable rights thereunder, the learned judge continued: " But those owning the upland in front of whom lay the absolute ownership of the city in the tideway, and who were already, or might be, cut off from the water by that ownership, had no such equity. A pre-emptive right in the extension without one in the tideway would do them no good by reason of that interposed strip, and would simply make the latter valueless to the city or its other grantee by in turn cutting off from both the water front." The court, with some hesitation, sus-

tained the equity of pre-emption claimed solely upon the ground that the city had granted both the filled-in land outside of the tideway, and a part of the tideway itself, to the claimant. This, however, was the utmost concession of rights to the riparian owner as is evident from the last sentence of the opinion: "If thus some little shred or faint shadow of riparian right on navigable waters is preserved in this state, through the sense of justice of the state and its municipal grantee, while on the longer coasts of other states the right is firmly pushed to low-water mark, and shielded by the law, we do not think the little thus gained is unwise, or inequitable, or an occasion of regret." Reference is made to the important case of *Whitney* v. *Mayor, etc.*, which, although decided in this court in 1855, is not reported in the regular series, but may be found in 6 Abb. New Cases, 329. (See, also, *People* v. *Tibbetts*, 19 N. Y. 523; *People ex rel. Loomis* v. *Canal Appraisers*, 33 N. Y. 461; *Kerr* v. *W. S. R. R. Co.*, 127 N. Y. 269, 277; *Canal Appraisers* v. *People ex rel. Tibbits*, 17 Wend. 571, and *Van Zandt* v. *Mayor, etc.*, 8 Bosw. 375.)

These cases establish the absolute power of the city to improve the water front for the benefit of navigation, free from any interference by the riparian owner, whose sole right as against the state or its municipal grantee, as the trustee for the public, is the pre-emptive right to purchase, in case of a sale, when conferred by statute. While such are the strict powers of the corporation, in practice, it has used them with that forbearance and moderation that is naturally expected of government, whether state or local, acting for the benefit of all the inhabitants. There is no evidence in this case that the corporation intended to use any part of the lands in question for its private advantage, or for any purpose except to aid the commerce of a great city, and it was admitted by the learned counsel for the corporation in his argument of this appeal that the defendants could not lawfully use these lands except for commercial purposes.

The elementary writers follow the authorities cited. Thus, Mr. Gerard, in his valuable work on Titles to Real Estate,

says, referring to the state of New York : " It has been established in this state by judicial decision that the legislature of the state has an inherent right to control and regulate the navigable waters within the state.　＊　＊　＊　The individual right of the riparian owner was considered　＊　＊　＊　as subject to the right of the state to abridge or destroy it at pleasure by a construction or filling in beyond his outer line, and that, too, without compensation made." (P. 853, 4th ed. See, also, Gould on Waters, §§ 138, 143 ; Angell on Tidewaters, 80 ; Moore's Foreshore & Seashore, 533; Hale De Portibus Maris, 85 ; De Jure Maris, 22.)

The cases in this state that are relied upon by the plaintiff do not vary the rule established by the line of authorities already referred to.　The _Rumsey Case_ (133 N. Y. 79), while it substantially overthrows the early case of _Gould_ (6 N. Y. 522), does not pass upon the rights of a riparian proprietor as against the state itself, or one of its political divisions, in improving the water front of a great port for important public purposes.　It simply decided that an owner of land on a public river can recover damages from a railroad company for building an embankment across his water front and depriving him of access to the navigable part of the stream.　The court, however, was careful to limit its decision to the case then in hand, which was against a private corporation with private interests to serve, and to declare that the " principle cannot, of course, be extended so as to interfere with the right of the state to improve the navigation of the river, or with the power of Congress to regulate commerce under the provisions of the Federal Constitution."　The _Saunders Case_ (144 N. Y. 75) was also against a domestic corporation, organized to make money for its stockholders by conducting the business of a common carrier of passengers and freight.　It did not involve the right of the state to promote navigation by furnishing greater facilities for commerce.　_Langdon_ v. _Mayor, etc._ (93 N. Y. 129), and _Williams_ v. _Mayor, etc._ (105 N. Y. 419), are not analogous, as they rest upon grants from the state of lands under water, with covenants for the enjoyment of wharfage,

acted upon at great expense by the grantee. The fact that no claim for compensation in those cases was made upon any other ground is significant. In *Yates* v. *Milwaukee* (10 Wallace, 497) much was said that favors the theory of the plaintiff, but all that was decided is that a wharf built by a riparian owner on the bank of a navigable river in the state of Wisconsin under a statutory permit cannot be declared a nuisance without a judicial trial. The later case of *Barney* v. *Keokuk* (94 U. S. 324) held that the public authorities may build wharves and make other improvements necessary to navigation below high-water mark upon navigable waters in the state of Iowa without the consent of the adjacent proprietor and without making him compensation. In other states some of the authorities are in accord, while others are opposed to the rule adopted in this state. (*Stevens* v. *Patterson & N. R. R. Co.*, 34 N. J. L. 532; *Payne* v. *English*, 79 Cal. 540; *Hess* v. *Muir*, 65 Md. 601; *Eisenbach* v. *Hatfield*, 2 Wash. 16; *Ladies' Seaman's Friend Society* v. *Halstead*, 58 Conn. 144; *Miller* v. *Mendenhall*, 43 Minn. 95; 8 L. R. A. 89; *Parker* v. *West Coast Packing Co.*, 17 Or. 510; 5 L. R. A. 61.) The want of harmony is probably owing to the difference in the rule as to the ownership of the tideway, which is held in some jurisdictions to belong to the state and in others to the riparian proprietors. This also accounts for the want of harmony in the Federal courts, as they follow the courts of the state where the case arose, unless some question arises under an act of Congress. (*St. Louis* v. *Myers*, 113 U. S. 566; *Barney* v. *Keokuk*, 94 U. S. 324, 340; *Willson* v. *Black Bird C. M. Co.*, 2 Pet. 245.) The only limitation that is placed by the courts of the United States upon the power of the several states over lands covered by tidewater within their respective limits is not for the protection of riparian owners, but to protect the public in the use of such waters and Congress in its paramount right to control navigation. (*Illinois Central R. R. Co.* v. *Illinois*, 146 U. S. 387.) While the case last cited is relied upon by the appellant it is really of little aid to him, as it simply announced the law of Illinois, but not that of New York.

The case of the *Duke of Buccleuch* v. *Metropolitan Board of Works* (L. R. [5 E. & I. App.] 418), also much relied upon by the appellant, is not in point, because it turned upon the construction of the statute rather than upon the common law. In that case a lessee from the crown of land on the river Thames, including some land under water, claimed damages under an act of Parliament, which authorized the construction of an embankment along the river bank in front of his property for the purpose, not of navigation, but of making a new street. (25 & 26 Victoria, ch. 93.) The act required compensation to be made for such damage, if any, as should " be sustained by him by loss of river frontage, or otherwise by reason of such embankment and roadway, or other the exercise of any of the powers of the act." As no claim was made except under the act, which expressly recognized the loss of river frontage as the subject of damages, the case is not regarded as an important authority upon the question now before us, notwithstanding the somewhat sweeping language used in the decision.

While we think it is a logical deduction from the decisions in this state that, as against the general public, through their official representatives, riparian owners have no right to prevent important public improvements upon tidewater for the benefit of commerce, the principle upon which the rule rests, although sometimes foreshadowed, has not been clearly set forth. Although, as against individuals or the unorganized public, riparian owners have special rights to the tideway that are recognized and protected by law, as against the general public, as organized and represented by government, they have no rights that do not yield to commercial necessities, except the right of pre-emption, when conferred by statute, and the right to wharfage, when protected by a grant and covenant on the part of the state, as in the *Langdon* and *Williams* cases. I think that the rule rests upon the principle of implied reservation, and that in every grant of lands bounded by navigable waters where the tide ebbs and flows, made by the crown or the state as trustee for the public, there is

reserved by implication the right to so improve the water
front as to aid navigation for the benefit of the general public,
without compensation to the riparian owner.  The implication
springs from the title to the tideway, the nature of the subject
of the grant and its relation to navigable tidewater, which has
been aptly called the highway of the world.  The common .
law recognizes navigation as an interest of paramount import-
ance to the public.  Thus, when the king used to grant an
exclusive right of fishing in navigable tidewater, as once he
lawfully might, if, in the course of time, the nets or weirs
interfered with navigation, they became a nuisance and could
be abated as such.  The grant was silent upon the subject,
yet the courts held that whatever impeded the superior right
of navigation was impliedly excepted from the effect of the
grant.  So, as it seems to me, when any public authority
conveys lands bounded by tidewater, it is impliedly subject
to those paramount uses to which government, as trustee
for the public, may be called upon to apply the water front
for the promotion of commerce and the general welfare.
The purpose for which the supreme authority holds the title
to lands under tidewater is inconsistent with the power to
grant any easement or right to those lands that will prevent it,
when the necessities of commerce demand, from " wharfing
out " to deep water, so that vessels can load and unload and
the interests of navigation be promoted.  It is a reasonable
inference from the nature of the grant in question made by
Governor Nichols, the circumstances surrounding him when
it was made, the pursuits of the grantees, the situation of the
port of New York with its growing commerce, that it was
well understood by both parties that the gratuitous convey-
ance was not putting a curb on the commerce of the chief
city of the continent for all time.  Twenty years later, when
his successor granted the tideway to the city of New York,
with the right to build thereon, there seems to have been
neither complaint nor question from the inhabitants of Harlem.
Nearly two centuries had passed before any claim to the tide-
way was made in hostility to that grant, so far as we are

advised.    The plaintiff now seeks to establish an easement
over the tideway against the city, and in order to do so, he
must also establish it against the English crown as well as the
state of New York, and show that the sovereign, as *parens
patriæ*, alienated a right that was essential to the most import-
ant public functions.    We think that no such limitation upon
the prerogative of the sovereign was intended, and that the
conveyance of the uplands in question to a subject should,
from public considerations of the highest importance, be held
to have been made with the implied reservation of the right
to freely improve the navigation of the great seaport, within
the general limits of which said uplands were situated.    The
permanent control of navigable waters, if alienable at all,
should only be so by an instrument showing a clear and
undoubted intention to that end, and in the absence of express
language the strict construction required by law in favor of
the sovereign, as trustee, limits the effect of the grant by
reserving or excepting therefrom the right to fill in the land
out to deep water and build wharves thereon in aid of naviga-
tion and as an indispensable incident to commerce.    (*People
v. N. Y. & S. I. Ferry Co., supra.*)    This conclusion makes
the riparian rights subordinate to those of the public for
commercial purposes and leaves unfettered the commerce of
the city of New York.    The inconvenience to the riparian
owner may, sometimes, be serious, but private convenience
must often suffer in order to develop the highest utility of a
great waterway.    It may be safely assumed that no public
authority will make an extreme or oppressive use of its rights
or unnecessarily inflict injury upon a citizen.

   Aside from the authorities cited and the inferences drawn
therefrom, we see no answer to the claim of the defendants
that the Dongan and Montgomerie grants were confirmed by
the first Constitution adopted in this state.    In 1732 the
colonial legislature enacted " that all and singular, letters
patent, grants, charters and gifts, sealed under the great seal
of the colony of New York, heretofore made and granted
unto the mayor, etc., of the city of New York, be, and are

hereby declared to be, and shall be good, valid, perfect, authentic and effectual in the law against the king's majesty, his heirs and successors, and all and every person and persons whomsoever, according to the tenor and effect of the said letters patent, grants, charters and gifts." (L. 1732, ch. 584.)

It cannot, in reason, be doubted that this specific act, confined to grants made to the city of New York, was intended, among other things, to confirm the Dongan and Montgomerie charters, the latter of which was less than two years old when the statute was passed. The effect of that act, standing alone, upon a grant made in violation of *Magna Charta*, it is unnecessary to now consider, for it was confirmed by the Constitution of 1777, which was the result of all the legislative power that the people of the state of New York, untrammeled by any higher law, could exert. The Constitution of the United States had not then been adopted, and the laws of England were no longer in force within the state, except as they were continued and confirmed by the Constitution of the state. There was no restriction, therefore, upon the power of the people to accomplish whatever could be effected through a fundamental act of legislation. The simple but weighty words of its first section were literally true, when it declared " that no authority shall on any pretence whatever, be exercised over the people or members of this state, but such as shall be derived from and granted by them." By the thirty-fifth section of that Constitution such acts of the legislature of the colony of New York as were in force on the nineteenth of April, 1777, which was the day before the Constitution was adopted, were continued in force and made the law of this state. The natural effect of this supreme enactment was to give the force of law to every unrepealed act standing upon the statute books of the colony. But the Constitution did not stop there, for by the next section it indirectly confirmed all grants of land made by the king, or by persons acting under his authority, prior to the fourteenth day of October, 1775, by providing " that all grants of land within this state made by the king of Great Britain, or by persons acting under his

authority, after the fourteenth day of October, 1775, shall be null and void; but that nothing in this Constitution contained shall be construed to affect any grants of land within this state made by the authority of the said king or his predecessors, or to annul any charters to bodies politic, by him or them, or any of them, made prior to that day." When the two successive sections, from which quotations have been made, are read in connection with the act of 1732, and in the light of the notoriety of the Dongan and Montgomerie charters, we think it was the intention of those who adopted our first Constitution, which did not require compensation for private property taken for public use, to ratify and confirm those grants, made for commercial purposes of the highest importance, and so essential to the prosperity of the city of New York.

If we have reasoned accurately thus far, the claim of title by the plaintiff, through alluvion or accretion, cannot be sustained. The doctrine of accretion rests upon an increase by imperceptible degrees through natural causes, such as the ordinary action of water. It does not apply to land reclaimed by man through filling in land once under water and making it dry. (*Mulry* v. *Norton*, 100 N. Y. 424, 432; *Halsey* v. *McCormick*, 18 N. Y. 147; Angell on Tidewaters, 71; 1 Am. & Eng. Encyc. of Law [2nd ed.], 467.) The city was not a wrongdoer in filling up the water front and constructing piers, as its action was justified by its ancient charters as well as by legislation, to which there is no constitutional objection. The land thus made, without trespassing upon the rights of any one, did not become the property of the plaintiff through accretion, but remained the property of the city for the benefit of the public as dry land, just the same as when it was land under water. It is claimed that *Steers* v. *City of Brooklyn* (101 N. Y. 51) is in conflict with these views. In that case, however, the city of Brooklyn had wrongfully built a pier in front of plaintiff's premises, and it was held that the pier by accretion became added to the plaintiff's land in so far as it was in front thereof. Steers owned to the water line, and the city of Brooklyn, which had no ownership in the shore

waters as they had never been conveyed to it, had no right to build a pier in front of his premises. It was, therefore, a trespasser in thus building the pier and shutting him off from the water privileges which before he had enjoyed as an easement to his bulkhead and which he had a right to use as against the city of Brooklyn and all the world except the state, or its lawful grantee, acting for the public. An increase owing to the action of a wrongdoer is an exception to the doctrine that to gain title by accretion the growth must be by imperceptible degrees and through natural causes. The *Steers* case stands upon that exception and has no application to the case now before us. Here the increase was neither imperceptible nor unlawful, and hence the plaintiff took nothing therefrom, and, as we think, the defendants can be deprived of nothing thereby.

We have examined with great care all of the exceptions relied upon by the appellant, but we find none calling for a reversal, and the judgment should, therefore, be affirmed.

All concur, except GRAY, J., absent.

Judgment affirmed.