FIRST CONST. CO. OF BROOKLYN v. STATE.

(Supreme Court, Appellate Division, Third Department. January 5, 1916.)

1. NAVIGABLE WATERS ☞36—LANDS UNDER TIDE WATER—TITLE AT COMMON LAW.

Under ancient common law the title of lands under tide waters vested in the king, who could grant and convey them; but the control of the waters, in the interest of commerce and navigation, was in Parliament, for the benefit of all subjects.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. ☞36.]

2. NAVIGABLE WATERS ☞43—LANDS UNDER TIDE WATER—RIGHTS OF UPLAND OWNERS.

The owners of uplands abutting upon tideways, with the consent of the Legislature and the approval of the Secretary of War, may erect wharves, piers, and bulkheads, and fill in the lowlands, to facilitate navigation, by affording means for the shipping and landing of articles of commerce.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 104, 256–265; Dec. Dig. ☞43.]

3. CONSTITUTIONAL LAW ☞205—NAVIGABLE WATERS ☞37—GRANT OF EXCLUSIVE PRIVILEGE IN LANDS UNDER TIDE WATER—"PROPERTY."

Laws 1884, c. 491, granting title to certain lands once under tide water to upland owners, is not violative of Const. art. 3, § 18, prohibiting the granting to any private corporation, association, or individual of any exclusive privilege, immunity, or franchise, since the grant is of property, within the meaning of section 20 of the article, providing that the assent of two-thirds of the members of each branch of the Legislature shall be requisite to every bill appropriating public moneys or property for local or private purposes.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 591–624; Dec. Dig. ☞205; Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. ☞37.

For other definitions, see Words and Phrases, First and Second Series, Property.]

4. NAVIGABLE WATERS ☞37—LANDS UNDER TIDE WATER—EXTENSION AND CONFIRMATION OF GRANTS—STATUTE—"GRANT."

Laws 1884, c. 491, provides that all grants of land under water within or to the exterior boundary line appearing upon a map of pier and bulkhead lines in Gowanus Bay filed with the Secretary of State on March 4, 1884, are made to extend, by the same course and direction, to such exterior boundary line, and are ratified and confirmed to the grantees and their assigns in fee simple. *Held*, that the statute, by using the word "grants" of land under water, meant persons who under previous acts had acquired rights to lands under water by reason of improvements made thereon, that under the statute such rights were extended to the exterior boundary line appearing on the map, meaning thereby the bulkhead line as finally established, by the same course and direction, and that such grants became ratified and confirmed to the owners in fee simple.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. ☞37.

For other definitions, see Words and Phrases, First and Second Series, Grant.]

5. NAVIGABLE WATERS ☞37—GRANT OF TIDELANDS—STATUTE—CONSTRUCTION.

Though a statute will be given a fair and liberal construction to meet the evident intent of the Legislature, where an act extending and confirm-

ing grants of land under tide-water to upland owners contained nothing to indicate an intention to change the fee of streets, none will be inferred.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. ⚖☞37.]

6. EMINENT DOMAIN ⚖☞90—ACQUISITION OF LAND FOR BARGE TERMINAL—DAMAGE.

Where tide water lands of Gowanus Bay were appropriated for a barge canal terminal that would make accessible the commerce of the Great Lakes and the Northwest, upland lots, whose access to the sea was not impaired, were not damaged, since the concentration of business at the point would increase their value, rather than diminish it.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 233; Dec. Dig. ⚖☞90.]

7. EMINENT DOMAIN ⚖☞201—PROCEEDINGS—EVIDENCE.

In proceedings before the Board of Claims of the state for compensation for damage to upland lots through condemnation of tide water lands in Gowanus Bay for a barge canal terminal, an instrument showing that the Secretary of War had approved of the abandonment of a certain basin, but had refused to sanction the closing of another, was proper, since all grants or appropriations of lands in New York Harbor are subject to the approval of the federal government, speaking through its Secretary of War.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 540½; Dec. Dig.. ⚖☞201.]

Appeal from Board of Claims.

Claim by the First Construction Company of Brooklyn before the Board of Claims against the State of New York. From a determination of the Board, both parties appeal. Affirmed.

The following is the report of Referee Haight:

The stipulation of the parties under which the above-entitled case was referred to me requires a determination of the questions of the title to the lands involved in the claim of the First Construction Company, including the fee of the streets, and all other questions of law, the determination of which is necessary for the disposition of the claim. In order to determine the legal questions, it became necessary to enter upon an extended investigation of many statutes, records, documents, and maps, including the taking of the testimony of witnesses, and an ascertainment of the facts which I have, so far as I deem material, included in the findings which I herewith present to the Board. The main question of law presented pertains to the construction which should be given to the statute of 1884 (chapter 491), and the determination as to whether its enactment was within the powers of the Legislature and in accord with the provisions of the Constitution.

[1] Under the common law of England the title of lands under tide waters vested in the king, who could grant and convey the same; but the dominion and control of the waters, in the interests of commerce and navigation, was exercised by Parliament for the benefit of all the subjects of the kingdom. After the Revolution and the separation of the colonies from the kingdom, the title of lands under tide waters, in and surrounding this state, under the Constitution adopted, vested in the people, who, through their executive and Legislature, exercised the powers that were formerly vested in the crown and Parliament, in trust, however, for the benefit of the public. The Legisture of the state have, therefore, from time to time enacted laws creating a land board of commissioners of the sinking fund empowered to grant lands under water to the upland owners; and in addition thereto the Legislature has from time to time by special acts made grants to individuals designed to be in aid of commerce and not inconsistent with public rights. These grants,

⚖☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

however, were all subject to the consent of Congress, who, under the commerce clause of the federal Constitution, is empowered to regulate interstate commerce. This power is now exercised by the Secretary of War under the provision of an act of Congress approved March 3, 1899.

[2] The owners of uplands abutting upon tideways are entitled to privileges or easements in excess of those possessed by the public. Such owners are not only riparian proprietors, who may pass to and from their own uplands across the tideway to the navigable waters, thus having access to all of their frontage, but in addition thereto they may load and unload boats, receive and ship goods, and thus engage in the commerce of the country. Such upland owners may, with the consent of the Legislature and the approval of the Secretary of War, erect wharves, piers, and bulkheads, and fill in the lowlands, so as to afford ways and means for the shipping and landing of articles of commerce, and thus facilitate navigation. When such improvements have been so made, the filling and structures, to the extent made, become a part of the realty and vest in the riparian owners a right of use in the nature of a grant, thus creating a right of property, of which they cannot be deprived without consent, except by due process of law or under the powers of eminent domain. Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592; Rumsey v. N. Y. & N. E. R. R. Co., 133 N. Y. 79, 30 N. E. 654, 15 L. R. A. 618, 28 Am. St. Rep. 600; Saunders v. N. Y. C. & H. R. R. Co., 144 N. Y. 75, 87, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729; Angell on Tide Waters, 22, 64; Lewis Bluepoint Oyster Co. v. Briggs, 198 N. Y. 287, 91 N. E. 846, 34 L. R. A. (N. S.) 1084, 19 Ann. Cas. 694; People v. N. Y. & Staten Island Ferry Co., 68 N. Y. 71.

[3] The statute of 1884 was passed by a two-thirds vote of the members elected to each branch of the Legislature. It therefore conforms to section 18, article 3, of the Constitution, which requires that a bill appropriating public moneys or property for local or private purposes shall pass only upon the assent of such member or members of each branch of the Legislature. It was not the granting to a private corporation, association, or individual of any exclusive privilege, immunity, or franchise prohibited by section 18 of the article alluded to, for in this case it was only the granting of a title to a piece of land under water to an upland owner thereof, which is property within the meaning of section 20 of the article. It may be that the public could not be excluded from the bulkhead when constructed, or the owners of vessels prevented from mooring their vessels alongside; but no such question is now presented for my determination. In this case the tideway extended over lowlands for a distance of between 2,000 and 3,000 feet from the upland. It was therefore deemed in the interest of commerce and for the benefit of the public that this space should be filled in, and thus enable the upland owners as well as the public to derive a benefit therefrom.

These conditions doubtless induced the prior Legislature to grant a permit to fill in and to erect wharves and piers. It may be that the claimant's predecessor in title exceeded his authority in constructing a pier on the bulkhead line across Hicks street basin, and it may be that he exceeded his authority in filling in the Hicks street basin between Bay street and Halleck street; but the Secretary of War is not here complaining, instead he has recently granted a permit to close the Hicks street basin and that at the request of the state. The state has not seen fit to appropriate the lands of the Hicks street basin lying between Halleck and Bay streets, for it has only appropriated up to the southerly line of Halleck street. No claim is made here for damages by reason of the taking of Hicks street basin, and consequently no allowance is claimed for the filling in of the northerly end of the basin above Halleck street. It may be that the act in question was unwise, but it is not my province to question the wisdom of the Legislature. I am unable to discover any provision that is violative of the provisions of the Constitution, or that was not within the powers of the Legislature to enact. I therefore pass to a consideration of its meaning.

[4] It will be observed that the act of 1884 by its title is to ratify and confirm certain grants made pursuant to chapter 702, § 3, of the Laws of 1873. A careful reading of that statute discloses by its recital that a board of government officers, appointed by the President to examine into and revise the ex-

terior and bulkhead lines of the harbor of New York, in a recent report made had stated that they had in their possession the requisite data for determining the pier lines in front of the Atlantic dock at Red Hook, the lines to Gowanus Bay and thence to Owls Head, but deemed it advisable to postpone the recommendation of that portion of the shore for a further report. Thereupon the Legislature enacted that upon the coming in of that report it should be lawful for the owners of the real estate fronting on the water between Hamilton ferry and the city of Brooklyn to Bay Ridge avenue and the town of New Utrecht, thus including Gowanus Bay, to construct and maintain bulkheads, with wharves and piers, and to fill in the same on the lands under water in front of their lands to the exterior bulkheads and pier lines so recommended.

It is true that this provision was made subject to the further action of the Legislature at its next session, and that no action at that session was taken; but in the following session, that of 1875, the whole subject was again considered, resulting in the act of that year in which the bulkhead line across Gowanus Bay was finally established and approved by the Secretary of War. It appears from the recitals in the act of 1884 that a special board of engineers appointed to establish and regulate the piers and bulkhead lines in the harbor of New York had presented a report to the Governor, with a map filed with the Secretary of State, containing a recommendation with reference to the pier and bulkhead lines in Gowanus Bay which follows the lines embraced in the act of 1875 (Laws 1875, c. 398). The act of 1884 concludes with the provision that "all grants of land under water within or to the exterior boundary line appearing upon said map and report made by the state are hereby made to extend by the same course and direction to such exterior boundary line, and are hereby ratified and confirmed as such, extending to the grantees thereof, and their assigns in fee simple."

It is evident, therefore, that the statute in question pertained to the bulkhead line of Gowanus Bay and consequently covers the lands appropriated. It is true that it uses the term "all grants of land under water," and it is claimed that there had been no grants of land under water. There had been a number of statutes passed, as we have seen, which made it lawful for the upland owners to erect piers, docks, bulkheads, etc., and to fill in lands. These provisions of the earlier statutes do not in terms grant any particular piece or parcel of land. It merely gives to the upland owners the right at their option to construct bulkheads, wharves and piers, and to fill in the land. They do not in terms grant in fee, but in so far as the upland owners have exercised the right given by the statutes to fill in, etc., they clearly obtained a property right therein in the nature of a grant, which the Legislature have the right to recognize and by act protect.

If, therefore, the statute in question, by using the word "grants" of land under water, meant those who under previous acts had acquired rights to lands under water by reason of improvements made thereon, then it would follow under the provision of the statute that such rights were extended to the exterior boundary line appearing upon the map, meaning thereby the bulkhead line as finally established, by the same course and direction, and, so extended, they became ratified and confirmed to the owner in fee simple. I am inclined to the opinion that such was the meaning and intent of the Legislature in adopting this provision of the statute; otherwise, no force or effect can be given to it, for there had been no formal deed of grants made to the upland owners of lands under water in front of their premises, except by the statutes to which I have referred.

[5] It is claimed on behalf of the claimant that the streets which were originally acquired under condemnation proceedings instituted by the city had become abandoned, and that the right to maintain them as streets no longer exists, and consequently the claimant became vested with the fee thereto. My attention has been called to the case of Robins Dry Dock Co. v. City of New York, 155 App. Div. 258, 140 N. Y. Supp. 96, and to the provisions of the General Statutes to the effect that the highways would be deemed abandoned if not opened within six years after their dedication. The contention of the claimant in this regard does not impress me favorably. It must be recalled that Henry and Columbia streets were specially located by act of

Legislature (chapter 327 of the Laws of 1876), and by the express provisions of the act each of them is declared to be "hereby opened and established." No action has been brought or direct proceedings instituted to have them declared abandoned, and, should there be a direct adjudication to that effect, the only result would be to destroy the public easement in the lands so laid out for the street purposes, leaving the fee standing unimpaired as it existed at the time of the passage of the act establishing them. At that time the fee was in the state, and there it remains unless it was changed by the Act of 1884. I have given that act what I deem to be a fair and liberal construction, meeting the evident intent of the Legislature; but there is nothing in the provisions of the act that indicates an intention to change the fee of the streets, any more than there is that of the basin, and in the absence of such intent none will be inferred under the circumstances of the case. I therefore am of the opinion that the fee of the streets mentioned, like that of Henry street basin and Hicks street basin, still vests in the people of the state.

[6] Much evidence has been taken with reference to the physical condition of the lands in the rear of and northerly from the highlands heretofore referred to. On the part of the claimant it is contended that these lands, although low, were drowned marsh, salt meadows, and mud flats, and that the title thereto vested in the upland owner; while on behalf of the state it was claimed that they were lands under water, and within the tideway, and vested in the state. A number of objections and exceptions were taken with reference to such evidence, some of which were received, reserving the right to strike out. Under the view taken by me, and the construction given to the statute of 1884, all of this evidence becomes immaterial. Its chief bearing is upon the question as to the right of the claimant to recover consequential damages for the lots owned by it, to which reference has been made in the findings. All of this territory has now been filled in, so that it is practically level and six or eight feet above the tideway. Even if it was in early times below or included in the tideway, so that the state was deemed to be the owner, they long since have been filled in by the upland owner, with the consent of the Legislature. He is deemed to have acquired such an interest therein that under the act of 1884 he is now deemed to be the owner thereof in fee.

Upon the argument of this case it was virtually conceded by the attorney for the claimant that there was no impairment of its access to the sea from its upland property by the appropriation of the state. I think it equally plain that there is no impairment of these lots as to value by reason of the appropriation for the barge canal terminal. The establishing of a canal terminal means the dredging of the bay and the fitting of it for transportation purposes; it means the bringing to it the commerce of the barge canal, which, tapping the Great Lakes, reaches a considerable portion of the commerce of the great Northwest, which it will bring to this terminal for distribution and transshipment. It means a terminal for the reception of merchandise designed for loading and shipment to ports in the territory which is reached through the canal and lakes. It is therefore manifest that the concentration of business at this particular point will greatly improve and increase the value of claimant's property, rather than diminish it.

The claimant offered in evidence the record in a partition action, and also the record in an action of ejectment. The state was not a party in either of these cases. The people having conceded that the claimant's predecessor in title was the owner of the upland, the evidence produced by these records afford no assistance in determining the questions presented, and therefore should be disregarded.

[7] Upon the trial the people introduced an instrument showing that the Secretary of War had approved of the abandonment of the Hicks street basin, but refused to sanction a closing of the Henry street basin. This evidence was objected to by the claimant. I think it was proper, for the reason that all grants or appropriations of the land in the harbor was subject to the approval of the federal government, who under the statutes alluded to speak through its Secretary of War.

Numerous requests to find facts and conclusions of law have been presented on behalf of the state and the claimant. I think that I have covered the facts that are material, and therefore the requests and conclusions of the respective parties may be deemed denied, except as found, and exceptions may be entered to each party to each of such requests.

Argued before KELLOGG, P. J., LYON, HOWARD, WOODWARD, and COCHRANE, JJ.

C. Walter Randall, of New York City (William N. Dykman, of Brooklyn, of counsel), for appellant.

Egburt E. Woodbury, Atty. Gen. (Joseph A. Kellogg, Arnold J. Potter, and Sanford W. Smith, Deputy Attys. Gen., of counsel), for the State.

PER CURIAM. Determination unanimously affirmed, without costs, on the opinion of the official referee

═══════════

**TERRANCE v. GRAY et al.**

(Supreme Court, Appellate Division, Third Department. January 5, 1916.)

1. INDIANS ⊂⊃27—JURISDICTION OF STATE COURTS.
     The state courts have jurisdiction of an action of ejectment between Indians to recover lands on an Indian reservation within the state.
     [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. ⊂⊃27.]

2. INDIANS ⊂⊃13, 15—LANDS—ALLOTMENT.
     Indian Law (Consol. Laws, c. 26) § 2, providing that a native Indian may take, hold, and convey real property the same as a citizen, relates only to the capacity of the Indian to take, and has no bearing upon the right of the tribe to convey or allot lands of the reservation.
     [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 30, 34, 37–44; Dec. Dig. ⊂⊃13, 15.]

3. EVIDENCE ⊂⊃36—JUDICIAL NOTICE—ALLOTMENT OF INDIAN LANDS.
     Where, in a suit involving Indian lands, there is nothing in the record to show that allotment was made of the lands by the nation owning and occupying them as common property, as contemplated by Indian Law, § 7, the court will take judicial notice of the fact that the tribe continues to hold its lands in common.
     [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 25; Dec. Dig. ⊂⊃36.]

4. INDIANS ⊂⊃13—LANDS—ALLOTMENT.
     Indian Law, § 7, permitting a nation or tribe which owns and occupies land as common property, by the act of its Indian government, to divide the lands into lots, and to distribute and partition it, does not contemplate turning over a certain lot to a certain Indian, the tribe retaining the rest, but requires a general partition, and hence does not apply to an allotment of lands to an Indian for cultivation and use only.
     [Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. ⊂⊃13.]

5. INDIANS ⊂⊃13—LANDS—ALLOTMENT.
     Indian Law, § 102, provided that the chiefs of the St. Regis Indians should allot to any Indian not possessing land, who made application, a reasonable and just portion of the tribal lands, and that the clerk

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes