(23 App. Div. 8.)

## DE LANCEY v. HAWKINS et al.

(Supreme Court, Appellate Division, Second Department.    December 7, 1897.)

1. ADVERSE POSSESSION—MARINE RAILWAY.
    Under Code Civ. Proc. § 368, relating to adverse possession, the fact that a defendant, in an action of ejectment brought by the owner of the legal title to recover lands below high-water mark under the navigable waters of the Sound at City Island, has during a continuous period of 20 years maintained a structure erected for use as a marine railway for hauling out vessels from the water, and extending some 550 feet beyond high-water mark, does not necessarily require the implication of a grant in fee to render it lawful, and is therefore not available to support the defense of adverse possession.

2. SAME—EVIDENCE.
    In such an action, defendant also set up a grant procured from the state in 1886 of the premises in question, both for promoting the commerce of the state and for beneficial enjoyment.    At the trial of the action, he testified that he got the grant from the state because he wanted the right to work the railway, and did not claim to own any land below high-water mark in fee.    Held, that this admission by itself disposed of his claim of having ever held by adverse possession.

3. GRANT FROM STATE—CONSTRUCTION.
    Held, further, that the rights of a grantee under such a grant must be construed strictly against the grantee.

4. SAME—LAND UNDER WATER—RIPARIAN RIGHTS.
    The lands in question had been originally granted by the crown to one Palmer, then owner of the upland, but in 1836 were conveyed by the comptroller to Hunter, under whom the plaintiff claimed.    Defendant, claiming under Palmer, was owner of the upland.    Held, that the grant to Hunter was within the power of the state to grant such land under water for the purpose of promoting the commerce of the state, against which the right of defendant, as owner of the upland, did not avail.

5. SAME—PROMOTION OF COMMERCE.
    The Palmer patent and the comptroller's deed to Hunter both contained reservations, which were incorporated in the judgment, which in effect secured to the people the same measure of enjoyment of the premises conveyed as they were entitled to before the conveyance, until the land should be actually appropriated and applied to the purpose of commerce or for the beneficial use of the owner, by the erection of docks and other structures thereon.    Held, that while the grant from the state in 1886, to defendant's predecessor, was made in pursuance of the powers reserved to it both expressly and by implication, the marine railway constructed and maintained by him, being a private enterprise, and used by defendant only in the conduct of his individual business, and with no right in others to use it without his permission, did not in any proximate sense promote the commerce of the state.

Appeal from trial term, Westchester county.

Action by Elizabeth D. De Lancey against John P. Hawkins and others.    From a judgment on a verdict directed by the court, defendant Hawkins appeals.    Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Lawrence Kneeland, for appellant.

Walter D. Edmonds (John Hunter, Jr., on the brief), for respondent.

GOODRICH, P. J.    The action is ejectment to recover the possession of a strip of land in front of the shipyard of the defendant Haw-

kins, at City Island, and extending out about 400 feet from high-water mark. The judgment awarded to the plaintiff the possession of three undivided fourth parts, and to the defendants, other than the defendant Hawkins, the possession of one undivided fourth part, of the premises in question. The premises are situated under the waters of Long Island Sound, adjacent to Minneford's, now called City Island, and are part of a large tract which extends from high-water mark outward, and under the waters of the Sound on the east, west, and south sides of the island. These lands were granted by the English crown to Benjamin Palmer, his heirs and assigns, by royal patent dated May 27, 1763, upon the tenure of free and common socage, and upon the express condition that he pay to the said crown or its successors, yearly forever, a certain rent. At the time of this grant, Palmer was the owner of the entire upland of the island. The colonial assembly, and afterwards the legislature of this state, the people having succeeded to the rights of the crown, passed a number of acts directing the grantees of lands chargeable with perpetual rents to redeem from their defaults, or, in case of failure thereof, declaring that such lands should be sold by reason of such nonpayment. It is not necessary to refer to these acts, other than chapter 222 of the Laws of 1819, whereby the lands so forfeited were directed to be sold by the comptroller of the state. Under this act the lands were sold on March 26, 1826, but the deed was not delivered until April 5, 1836, when the comptroller duly transferred by patent the said premises to Elias D. Hunter, who on April 1, 1851, leased the premises to Joshua Leviness for a term of six years, and at the end of that term made a further lease of said premises for a term of five years, both of which leases were duly recorded. Hunter died on March 22, 1865, leaving a will, under which the property passed, subject to the life estate of his widow, to his two daughters, Mrs. De Lancey, the plaintiff, and Adele Hunter, share and share alike. The widow died, leaving Adele surviving her, but she also is dead, leaving, her surviving, as next of kin and only heirs at law, the plaintiff and one John Hunter. Thus it appears that the plaintiff was the owner of three-fourths of the estate, and John Hunter was the owner of one-fourth, as tenants in common. On December 12, 1893, John Hunter conveyed his interest in the premises to the defendants other than the defendant Hawkins.

In the spring of 1867, one Fordham, who by various mesne conveyances, originating with Palmer, had become owner of a portion of the upland, leased the same to one Hillman. The lease is not in evidence, but I assume that it conveyed the same premises as were subsequently conveyed by Fordham to Hillman, in April, 1872. The premises in this deed had a frontage on the Sound of about 192 feet. When Hillman obtained his lease, he constructed certain shipways or marine railway in front of such premises, at a cost of from eight to ten thousand dollars. These were designed and used by Hillman for the purpose of hauling out vessels from the water to the land, and they extended some 400 feet below high-water mark. In 1877, Hillman leased the premises to the defendant Hawkins. In December, 1886, Hillman, at the request of Hawkins, procured a

grant from the state for the premises under water, upon a part of which the railways were built.    The grant was both for promoting the commerce of the state and for beneficial enjoyment.    These premises, the subject of this action, are said in the grant to contain 1.417 acres, more or less, and are a part of the strip of land under water contained in thê Palmer patent.    On December 1, 1887, Hillman and wife conveyed the upland to the defendant Hawkins, and also gave him a quitclaim deed of the premises named in the grant. Previous to this time, and when he went into possession of the premises under the lease, Hawkins partially rebuilt the marine railways, and extended them out to a distance of 550 feet from highwater mark.    This structure was of a somewhat more durable and permanent character than that which had been erected by Hillman. On April 5, 1894, the plaintiff conveyed to Walter D. Edmunds the undivided fourth of the lands in question under water, being that part which she had inherited from her sister, Adele; and this action is instituted by Edmunds, in the name of the plaintiff, pursuant to section 1501 of the Code of Civil Procedure.    The defendants, other than the defendant Hawkins were made parties defendant, upon the allegation that they had refused to join as plaintiffs in the action.

The complaint alleges that the defendant Hawkins is wrongfully in possession, and unlawfully holds possession, of the said lands under water, and demands judgment for the plaintiff for the possession of three undivided parts thereof.    The defendants other than the defendant Hawkins answered, and demanded judgment against the defendant Hawkins for the possession of the other fourth part of the premises.    The defendant Hawkins admits that he has entered upon the possession of the premises, but denies that the same is unlawful. and alleges that neither the plaintiff nor any one from whom she derives title was seised of the premises within 20 years before the commencement of the action, and that he (the defendant Hawkins) and Hillman have held undisputed and possessed the premises adversely to the pretended title of the plaintiff for 20 years, and that, as owner in fee in possession of the upland. he has all the riparian rights appertaining thereto, including the right to build and maintain a marine railway which has been used by him in his business of shipbuilder.    The issues thus framed came on for trial before the trial term in Westchester county.    At the close of the testimony, the plaintiff's counsel moved for the direction of a verdict in favor of the plaintiff and the defendants other than the defendant Hawkins, and the defendant Hawkins moved for the dismissal of the complaint and of the demand of the other defendants for affirmative relief.    This motion was denied, and he excepted, and subsequently asked to go to the jury upon the question whether so much of the premises as are covered by the marine ways had been actually held by the defendant Hawkins and his grantors adversely to the plaintiff and the other defendants for more than 20 years before the commencement of this action.    The court directed a verdict as requested by the plaintiff, and, from the judgment entered upon the verdict, the defendant Hawkins appeals.

The learned justice based his refusal upon the authority of De Lancey v. Piepgras, which has been many times before the courts. The first report will be found in 63 Hun, 169, and 17 N. Y. Supp. 681. This was affirmed in 138 N. Y. 26, 33 N. E. 822. As reported in 73 Hun, 607, and 26 N. Y. Supp. 806, it was affirmed in 141 N. Y. 88, 35 N. E. 1089. In the case as reported in 138 N. Y. and 33 N. E. the court sustained the title of Mrs. De Lancey to the lands embraced in her patent, and held that the title of Piepgras to ways of the same general character as those of the defendant Hawkins did not constitute adverse possession to the lands, or a permanent appropriation thereof. It is stated in the opinion of Judge Maynard that there was no permanent appropriation of the soil; that the structures in that case were of a temporary character, and designed simply to afford a means of access between the upland and the navigable waters of the Sound; and that a title in fee will never be presumed from user where an easement only will secure the privilege enjoyed; and that:

"From the nature of the property, it is difficult to show such a possession of lands under water as is required to support the presumption of a grant; and we fail to find any case where anything short of a permanent and exclusive occupation of the soil has been regarded as sufficient. Busw. Lim. § 244; McFarlane v. Kerr, 10 Bosw. 249."

The use which the appellant's grantor made of this property for any continuous period of 20 years is not shown to have been of such a kind as to necessarily require the implication of a. grant in fee to render it lawful; and it is therefore not available as a defense when the owner of the legal title seeks to recover the fee. By section 368 of the Code of Civil Procedure, in an action of this character, the person who establishes a legal title to the premises is presumed to have possession thereof within the time required by law; and the occupation of the premises by another person is presumed to have been under and in subordination to such legal title, unless the premises have been held and possessed adversely to the legal title for 20 years before the commencement of the action. This section was held to apply to the structure of Piepgras, and we think it applies equally to the structure of Hawkins. We approve the decision of the learned justice at circuit in holding that the premises of the defendant Hawkins, although a little more permanent and substantial than those of Piepgras, were of the same general character. The denial of the request of Hawkins to go to the jury on that question was proper.

Since the argument of this case, and at the current term, the court of appeals has decided the case of Sage v. Mayor, etc., 154 N. Y. 61, 47 N. E. 1096. The premises which were the subject of controversy were lands in the upper part of New York City, running out into the East river, the plaintiff claiming title thereto under the charter of Gov. Nichols, and the defendant under the Dongan charter. The lands were what are called the "tideway lands," between high and low water mark. Judge Vann, in delivering the exhaustive opinion of the court, held that where lands are described in a deed as bounded by a navigable river, where the tide ebbs and flows, the title ends at high-water mark, as the law stood in 1767 and as it stands to-day, and that, while the title of such owners did not extend beyond the

dry land, they were entitled, as against all but the crown, as trustee for the people at large, to certain valuable privileges or easements, including the right of access to the navigable part of the river for the purpose of unloading boats, drawing nets, and the like; that these riparian rights were property belonging to the riparian owner, who could not be deprived of them without his consent or by due process of law, although he could only use them subject to the rights of the public.    He cited with approval the remarks of Mr. Gerard in his valuable work on Real Estate (4th Ed., p. 853), where he said:

"It has been established in this state by judicial decision that the legislature of the state has an inherent right to control and regulate the navigable waters within the state. * * * The individual right of the riparian owner was considered * * * as subject to the right of the state to abridge or destroy it at pleasure, by a construction or filling in beyond his outer line, and that, too, without compensation made."

As the state has this power, it has equal power, for the purpose of promoting the commerce of the state, or for the purpose of the beneficial enjoyment of the owner of the upland, to grant the land under water; and it made such grant to the plaintiff's ancestors when, by patent, in 1836, it granted to the plaintiff's predecessors in title the land around a large portion of City Island, between high and low water mark, including the premises in question.    The subsequent grant to Hawkins, in 1886, purported to be a grant of the premises in question for promoting the commerce of the state, and for his beneficial enjoyment.

It will be observed that there is no evidence that, since the issuing of that grant, Hawkins has made any considerable improvement of the premises, his improvements having been made only when he went into possession under lease from Hillman, in 1872.    It must also be held that the rights of a grantee under a grant of the character of the Hawkins grant must be construed strictly against the grantee. Hawkins testified that he got the Hillman grant from the state in 1886, because he wanted to have the right to work his railway, and did not claim to own any land below high-water mark in fee.    Hawkins, when under examination, testified:

"The ways are used only for marine purposes.    Mr. Hillman got this grant of land under water from the state.    I thought it was his duty to do it to protect me, so that, in case vessels ran in on the railways, I had protection.    They would pay for repairs on the ways, and they wouldn't sue me for damages for having the obstruction there.    I did not know whether I had a right or not to put an obstruction out there without a grant from the state.    It was built without a grant, but, as I told Mr. Hillman when I leased the place, I thought it was his duty to get a grant to protect me, which he did.    I wanted to have the right to do work, and, in case a vessel came ashore to get damages, they couldn't sue me, but I could make them pay for the damages they done me."

This testimony becomes important in view of the law well stated in the case of Colvin v. Burnet, 17 Wend. 564, 569, where the court said:

"It is well known that a single lisp of acknowledgment by the defendant that he claims no title fastens a character upon his possession which makes it unavailable for ages.    No matter that, in the language of these pleas, he and those under whom he claims may have holden peaceably, and without the hindrance, molestation, or even claim of the owner."

And this would seem to dispose of Hawkins' contention that he has ever held the premises by adverse possession against the other parties to the action.

Neither does the easement of Hawkins as a riparian owner avail him. Such was the decision of the court in De Lancey v. Piepgras, supra. In accordance with the opinion of the court in that case, we are compelled to affirm the judgment so far as it awards the possession of the premises.

It remains to examine the effect of the inclusion in the judgment, in ipsis verbis, of the proviso contained in the Palmer patent, which was referred to by Judge Maynard in the case of De Lancey v. Piepgras. It is to the effect that if Palmer, his heirs or assigns, shall at any time erect or build any wharf or any other building or thing whatsoever on the premises, or on any part thereof, so as in any manner to obstruct, hurt, or prejudice the navigation of the said Sound, or to make it at any time less commodious for ships to navigate, then the grant shall be void, except such parts of the premises as shall at such times be covered with wharves or buildings by Palmer, his heirs or assigns, reserving to the crown all rights and privileges in every part of the premises not covered with wharves or buildings, as aforesaid, as fully as if the grant had not been made. Judge Maynard, in commenting upon this proviso, said:

"The property rights granted to Palmer were similar in terms to the grants of land under water by the commissioners of the land office, and contained similar reservations, which secure to the people the same measure of enjoyment of the premises conveyed as they were entitled to before the conveyance, until the land has been actually appropriated and applied to the purpose of commerce, or for the beneficial use of the owner, by the erection of docks and other structures thereon. The deed to Hunter is expressly limited to the lands granted to Palmer, and did not vest in him any rights which the crown had reserved, and which passed to the people, as the successors of the royal power, and of which they did not become possessed by means of the forfeiture of the grant."

The comptroller's deed contained the following habendum clause: "To have and to hold the same to the party of the second part, his heirs and assigns, subject to all claims which the people of the state have therein." Under this clause, the state reserved the right to make other grants to riparian owners for the purpose "of promoting the commerce of said state, and for the beneficial enjoyment of the adjacent owner."

In the case of Sage v. Mayor, etc., supra, the court said:

"While we think it is a logical deduction from the decisions in this state that, as against the general public, through their official representatives, riparian owners have no right to prevent important public improvements upon tide water for the benefit of commerce, the principle upon which the rule rests, although sometimes foreshadowed, has not been clearly set forth. Although, as against individuals or the unorganized public, riparian owners have special rights to the tideway that are recognized and protected by law, as against the general public, as organized and represented by government, they have no rights that do not yield to commercial necessities, except the right of pre-emption, when conferred by statute, and the right to wharfage, when protected by a grant and covenant on the part of the state, as in the Langdon and Williams Cases [93 N. Y. 129, and 11 N. E. 829]. I think that the rule rests upon the principle of implied reservation, and that in every grant of lands bounded by navigable waters, where the tide ebbs and flows, made by the crown or the

state as trustee for the public, there is reserved by implication the right to so improve the water front as to aid navigation for the benefit of the general public, without compensation to the riparian owner. The implication springs from the title to the tideway, the nature of the subject of the grant, and its relation to navigable tide water, which has been aptly called the 'highway of the world.' The common law recognizes navigation as an interest of paramount importance to the public. Thus, when the king used to grant an exclusive right of fishing in navigable tide water, as once he lawfully might, if, in the course of time, the nets or weirs interfered with navigation, they became a nuisance, and could be abated as such. The grant was silent upon the subject; yet the courts held that whatever impeded the superior right of navigation was impliedly excepted from the effect of the grant. So, as it seems to me, when any public authority conveys lands bounded by tide water, it is impliedly subject to those paramount uses to which government, as trustee for the public, may be called upon to apply the water front for the promotion of commerce and the general welfare. The purpose for which the supreme authority holds the title to lands under tide water is inconsistent with the power to grant any easement or right to those lands that will prevent it, when the necessities of commerce demand, from "wharfing out" to deep water, so that vessels can load and unload and the interests of navigation be promoted."

The result of these two decisions and the reservations of the Palmer patent and the comptroller's deed to Hunter is that the state was still the owner, and possessed the power of erecting wharves and structures, so as to "so improve the water front as to aid navigation for the benefit of the general public, without compensation to the riparian owner"; navigation being an "interest of paramount importance to the public," and the state being possessed of these rights to grant, at least to the riparian owner, and to him alone, under the statute (1 Rev. St. [9th Ed.] p. 406; the law being the same in 1886), the right to erect wharves and bulkheads in the public interest of navigation. In pursuance of this power, the state, in 1886, made its grant to Hillman for the purpose of promoting the commerce of the said state, and for the beneficial enjoyment by Hillman of the premises upon which his marine railway was constructed. But the railway is a private enterprise, and used by Hawkins only in the conduct of his own individual business, and no one can use the same without his permission. If Hillman had erected a public wharf, the public would have been entitled to use it on payment of wharfage (Heaney v. Heeney, 2 Denio, 627); and a very different question would have arisen. But this is not true of the structure of the defendant Hawkins, and the distinction is a clear one. It makes no difference that, in an ultimate sense, the structure is designed for the benefit of vessels employed in navigation. Its proximate use is for the individual benefit of the defendant Hawkins.

We are thus forced to the conclusion that the judgment must be affirmed. All concur except CULLEN, J., concurs in the result.