THE FIRST BAPTIST CHURCH AND SOCIETY OF NORWICH, N. Y., and Another, Plaintiffs, *v.* JOSEPH LETSON and Another, Defendants.

Supreme Court, Chenango County, July 8, 1932.

*Hubert L. Brown,* for the plaintiffs.

*Ward N. Truesdell,* for the defendants.

PERSONIUS, J. The plaintiffs and defendants own and occupy adjoining lots. The plaintiffs sue for an injunction restraining the defendants from using a strip of the plaintiffs' land, adjacent to the defendants' lot for a common driveway. The defendants, alleging the existence of a common driveway between the lots, demand that the plaintiffs be enjoined from interfering therewith.

The following plot of the premises will tend to clarity:

The plaintiff church owns Lot A. The plaintiff Ashmore occupies it. The defendants own Lot B, which was formerly divided into Lots B-1 and B-2. On the plaintiffs' lot is a single house. On the defendants' lot is a double house.

The defendants say that there is a common driveway extending from Hays street northerly to the rear of the two houses, and and that the center of this driveway is the line XY between the two properties. There is no dispute as to the location of this line. There is no claim that such driveway is established or even referred

to in any deed in the chain of title of either property. The defendants depend upon adverse user to establish their right in such driveway.

Lot A was owned and occupied by Abram Thomas from 1865 until the time of his death and by his heirs, and the survivor of them, from his death until 1914. By the will of the surviving heir, it was devised to the plaintiff church, subject to a life estate which terminated in 1918. Then the church became the absolute owner of said Lot A.

Lot B-1 was owned by A. Billings Packer from 1888 to 1915. It was occupied by him and his sister, Sarah Packer, who upon her brother's death in 1915 became the owner. She remained the owner and occupant until her death in 1922. Two years later (1924) the defendants acquired Lot B-1 and have since owned and occupied it.

This action was commenced in October, 1929. Thereafter, and in 1931, the defendants acquired Lot B-2, so that at the time of the trial the defendants were the owners of the entire Lot B and the double house located thereon. They occupied the easterly half and apparently rented the westerly half.

The plaintiffs rely on their record title, which is subject to no easement for a driveway. The defendants rely upon alleged continuous adverse user of a driveway for upwards of twenty years. Have they established it?

We think the evidence fails to show such adverse user. Bear in mind that the Thomas family owned and occupied Lot A from 1865 to 1918, and the Packer family owned and occupied Lot B-1 from 1888 to 1924. The evidence shows only this, that during the period when these two families owned and occupied the adjoining premises, each, to a greater or less extent, used the space between the houses for delivering coal to the respective houses and removing ashes therefrom. Even this limited use is not shown to have been continuous. Practically no other user is established. User for these purposes extended from the street northerly between the houses but not to the extreme rear of the houses.

Neither party seems to have had any occasion or use for a driveway until the defendants acquired Lot B-1 in 1924. Prior to 1924, beyond dispute, there was no barn or other building in the rear of the house on Lot B-1 (or B-2 for that matter). Its occupant kept no horse or automobile and had no occasion to use a driveway for such purpose. The evidence of both parties establishes that the ground in the rear of the house on Lot B-1 was occupied by flowers and shrubs. Sarah Packer's flower garden seems to have been so impressive that it was definitely recalled by every witness.

This condition seems to have continued until the defendants erected their garage about 1927. It was the first building in the rear of either Lot B-1 or B-2.

There was an old barn in the rear (northwest corner) of Lot A until 1927, when it was removed. While standing it was used principally for storage, except that after the defendants acquired and occupied Lot B-1 in 1924, they *rented* this barn for about three years. While occupying the barn as *tenants of the plaintiff church*, they had ingress and egress to it through the alleged common driveway. (It will be noted that this was within twenty years, and, what is probably more important, was under a *lease* from the plaintiff church.)

When the defendants ceased to use the rented barn on Lot A, they erected a double garage in the rear of the house on Lot B-1 and continued to use this alleged common driveway for ingress and egress to and from such garage. This was about 1927. In 1929 the plaintiffs erected a fence on the line between the respective properties. The defendants removed it. It was reerected and again removed by the defendants. This action followed.

The witnesses by whom the defendants sought to prove the existence of a well-defined driveway prior to 1924 (when the defendants rented the barn of the plaintiff church), failed to show more than the occasional delivery of coal and removal of ashes in vehicles passing over the space between the houses, sometimes and somewhat on the lands of both adjacent owners. Detailed comment on the evidence of the several witnesses would be too burdensome and unnecessary. Two or three witnesses did refer to a " well-defined driveway," " substantially as now." However, when pressed for a more detailed description they admitted that there was no beaten track, no more than a few wheel tracks, tracks cut in the soft ground with grass around, no hard drive, but only a grass drive for coal, etc., ruts from wagon wheels, etc. The plaintiffs' witnesses, one of whom boarded with the Packer family and later visited there, say that the use of the space in question was limited to the occasional delivery of coal and removal of ashes, making tracks back to the side steps only; that the area was seeded, a lawn, though perhaps not a good one.

The plaintiffs' house stands eight feet and five inches from the lot line; the defendants' house eight feet four inches (each measured at the narrowest point). Indicative of the Packers' and Thomas' understanding of the existence, or rather non-existence, of a common drive is the fact that the Packers maintained, not a porch, but

a movable platform with steps which could be and were removed to permit the delivery of coal. The defendants after acquiring the house placed a roof over and a rail around this platform. Mr. Thomas, on one occasion at least, was seen filling the ruts, " smoothing up " the lawn. There was at one time a fence between the rear yards which came so near the houses as to preclude a common driveway to the rear thereof.

The Packer and Thomas families were old neighbors. Apparently each permitted the other, when filling the coal bin or emptying the ash pit, to drive over the area between the front portions of their respective houses without always hewing to the division line. Very expressive is the statement of Mr. Packer that he could not drive on his own land without moving his steps, but that Mr. Thomas was friendly and never objected. Each owner apparently yielded to the other a neighborly license and nothing more.

The defendants have not established a prescriptive right to use any of the land owned or occupied by the plaintiffs for a driveway. (*Sebring* v. *Fitzgerald*, 142 Misc. 474; *Sewell* v. *FitzGibbon*, 233 App. Div. 70; *Nellis* v. *Countryman*, 153 id. 500; *Hinkley* v. *State of New York*, 234 N. Y. 309, 316; 19 C. J. 902.) The quotation in the defendants' brief from 19 Corpus Juris, 902, is followed by this statement: " However, where the owners of land used an alleyway for their mutual convenience, the user being occasional, permissive, and for broken periods of time, no right of way in the alley was established by prescription."

Furthermore, the defendants at best show that common property was used for a short distance from the street for a limited purpose and for the benefit of Lot B-1. Now they seek to use common property back to their double garage, daily, for the benefit of both Lots B-1 and B-2. " A right of way for one purpose gained by use cannot be turned into a right of way for another purpose, if the latter adds materially to the burden of the servient estate, and the right derived from user can never outrun or exceed the user in which it had its origin." (*American, etc., Co.* v. *N. Y. E. R. R. Co.*, 129 N. Y. 252, 266.) (See, also, 1 Reeves Real Prop. 198, 199; 9 R. C. L. § 35, p. 776.)

Finally it appears that Mr. Letson requested time to arrange his own driveway. He applied for and obtained a permit to cut the curb for a drive on his own land. This was an acknowledgment that he was not using the common drive under a claim of right. Such acknowledgment by one defendant can be taken against both. (*Matter of Kennedy*, 167 N. Y. 163, 177.) Such acknowledgment seems fatal to their present claim. (*American, etc., Co.* v. *N. Y. E. R. R. Co.*, 129 N. Y. 252, 269; *Colvin* v. *Burnet*, 17 Wend.

564, 569; cited in *DeLancy* v. *Hawkins*, 23 App. Div. 8, 14; *Cutting* v. *Burns*, 57 id. 185, 191.)

The defendants urge the fact that when Hays street was paved in 1911 there was constructed a concrete approach from the curb to the sidewalk about one-half on each property. They cite *Olofson* v. *Malpede* (216 N. Y. Supp. 695), but CROSBY, J., there said in reference to a similar fact: " Standing alone, it is not a matter of great importance." In addition the paving was done within twenty years.

In most of the cases cited by the defendants, the evidence establishing a prescriptive right was " undisputed " and not " conflicting." Instance, *Colburn* v. *Marsh* (68 Hun, 269); *Nicholls* v. *Wentworth* (100 N. Y. 455); *Townsend* v. *Bissell* (4 Hun, 297).

Plaintiffs are entitled to the relief demanded in the complaint.