In the Matter of the Application of THE CITY OF NEW YORK to Acquire Title to Certain Lands, etc., Necessary to Establish a Public Driveway, Commonly Called the Speedway.

FREDERICK Booss, Appellant; THE CITY OF NEW YORK, Respondent.

1. WATERS — RIPARIAN PROPRIETORS UPON TIDE WATERS. The patentees in the grant from Governor Nicolls in 1667 of land whose easterly boundary was therein described as the Harlem river were riparian proprietors upon tide water with such title, rights and privileges as belong at common law to the owners of upland washed by water the tide whereof ebbs and flows.

2. COLONIAL GRANT — HARLEM TIDEWAY. As against such proprietors the language of the patent to the city of New York granted by Governor Dongan in 1686, giving the grantee the right to build upon or make use of the tideway around the island of Manhattan "as to them shall seem fit," gives the city no rights which it would not have had under a simple conveyance in fee.

3. IMPLIED RESERVATION TO IMPROVE NAVIGATION. The implied or reserved rights of the state or city of New York as trustee for the public in and to the tideway of the Harlem river and the waters beyond do not

extend to any public use thereof for purposes not related to or connected with navigation or commerce.

4. CONSTRUCTION OF SPEEDWAY NOT AN EXERCISE OF RESERVED RIGHT TO IMPROVE NAVIGATION. The construction on the tideway of the Harlem river of a speedway one hundred and fifty feet wide and from five to eight feet in height above the tideway, from which are excluded all forms of commercial traffic or intercourse and which can be crossed only by means of subways or overhead bridges available to pedestrians alone, is not an exercise by the city of New York, as successor to the rights of the crown under the patent from Governor Dongan in 1686, of its reserved power, as trustee for the public in and to the tideway and waters beyond, to make improvements for the benefit of navigation.

5. EMINENT DOMAIN — COMPENSATION FOR DESTRUCTION OF RIPARIAN RIGHTS. The owner of uplands abutting on the Harlem river is entitled to compensation for the taking and destruction of his riparian rights by the appropriation of the tideway by the city of New York for purposes not related to nor connected with navigation or commerce.

6. APPEAL — REVERSIBLE ERROR. The refusal of the commissioners of estimate and assessment appointed in a proceeding instituted by the city of New York, under chapter 102 of the Laws of 1893, to acquire title to lands necessary to the construction of a driveway upon the Harlem tideway, to consider whether a riparian proprietor has been injured by the destruction of his riparian easement and the extent of his injuries, if any, constitutes reversible error, although before the construction of the driveway his riparian rights were of a very limited character and his lands may have been less valuable than they now are.

*Matter of City of New York*, 60 App. Div. 122, reversed.

(Argued June 7, 1901; decided October 1, 1901.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, made April 26, 1901, affirming an order of Special Term which confirmed the report of commissioners of estimate and assessment appointed in a proceeding to acquire the title to certain lands, pursuant to chapter 102 of the Laws of 1893.

The facts, so far as material, are stated in the opinion.

*Henry Grasse* and *Theodore H. Friend* for appellant. The Harlem river is a navigable highway under the jurisdiction of the United States, by cession from the city and state of New York. (*Matter of U. S.*, 96 N. Y. 227.) The title of the king to all land under water was, by the common law of Eng-

land, at the time of the Dongan charter, in trust for the benefit of the public and subject to the duty to hold and convey only, subject to the rights of the public for the benefit of commerce and navigation. (Moore's Foreshore & Seashore [London ed. 1888], 41; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 76; *Blundell* v. *Catteral*, 5 Barn. & Ald. 268; *D. & H. C. Co.* v. *Lawrence*, 2 Hun, 166; *Stokes* v. *Middleton*, 28 N. J. L. 35; *Bennett* v. *Garlock*, 79 N. Y. 317; *Fisher* v. *Fields*, 10 Johns. 504; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 557; *Langdon* v. *Mayor*, etc., 93 N. Y. 144.) The riparian owner at the time of the Dongan charter held, appurtenant to his owner-ship of the bank, an easement of access and of way over the water of the river, in common with all the public, for naviga-tion and commerce. (*Van Dolsen* v. *Mayor*, etc., 21 Blatchf. 455; *Barney* v. *Keokuk*, 94 U. S. 324; *St. Louis* v. *Rutz*, 138 U. S. 246; *I. C. R. R. Co.* v. *Illinois*, 146 U. S. 387; *Buccleuch* v. *Met. Bd. of Works*, 5 E. & I. App. 443.) The words of the conveyance to the city by the Dongan char-ter, section 14, "to build upon as to them shall seem fit," are to be held applicable rather to the indented and diversified upland than to the strip of foreshore and tideway. (*Bedlow* v. *N. Y. F. D. D. Co.*, 112 N. Y. 273.) The abutting owner on a navigable river has an easement of way as one of the public to navigation and commerce of the river, precisely as an abutting owner on a street has an easement of light, air and access to a street. (*Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522; *Rose* v. *Groves*, 5 Mann. & G. 613; *Lyon* v. *Fish-mongers Co.*, L. R. [1 App. Cas.] 662; *Kane* v. *N. Y. El. R. R. Co.*, 125 N. Y. 184; *Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 87; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 87; *Hedges* v. *W. S. R. R. Co.*, 150 N. Y. 150.) This easement is a constitutional right of property and cannot be taken away without compensation. (*Kane* v. *N. Y. El. R. R. Co.*, 125 N. Y. 184; *Lahr* v. *Met. El. Ry. Co.*, 104 N. Y. 291; *Smith* v. *City of Rochester*, 92 N. Y. 484.) It matters not how many times, by act or Constitution, these grants by charter to the city were, as is alleged, confirmed,

These so-called confirmations did not widen the scope of the grants or relieve them from the incumbrance of the riparian owner's rights over the tideway or the trust to respect them. (*Demarest* v. *Mayor, etc.*, 74 N. Y. 168 ; *Bradshaw* v. *Rodgers*, 20 Johns. 103 ; *Gardner* v. *Newburgh*, 2 Johns. Ch. 382.) The riparian owner, the appellant, is claiming only the right of all the public, and not any exclusive right as against the public. (*Gould* v. *H. R. R. R. Co.*, 6 N. Y. 550 ; *D. & H. C. Co.* v. *Lawrence*, 2 Hun, 166 ; 56 N. Y. 612.) The statute under which this proceeding is taken (L. 1893, ch. 102) requires that the appellant should be compensated for the " easements, rights and privileges " of which he was deprived by the erection of the driveway, which were his access and right to the channel of the Harlem river for commerce and navigation. (*Towle* v. *Remsen*, 70 N. Y. 322.)

*John Whalen, Corporation Counsel* (*Theodore Connoly* of counsel), for respondent. The land in the tideway is owned in fee absolute by the city. (*Jarvis* v. *Lynch*, 157 N. Y. 445 ; *Sage* v. *Mayor, etc.*, 154 N. Y. 61 ; *Mayor, etc.*, v. *Hart*, 95 N. Y. 443 ; *Furman* v. *Mayor, etc.*, 10 N. Y. 567 ; *Towle* v. *Remsen*, 70 N. Y. 303 ; *Whitney* v. *Mayor, etc.*, 6 Abb. [N. C.] 329 ; *People* v. *Tibbetts*, 19 N. Y. 523 ; *People ex rel.* v. *Canal Appraisers*, 33 N. Y. 461 ; *Kerr* v. *W. S. R. R. Co.*, 127 N. Y. 269 ; *Canal Appraisers* v. *People*, 17 Wend. 571.) The construction of a driveway is a public use. (*Doll* v. *Devery*, 27 Misc. Rep. 149 ; *C. I. Co.* v. *Mayor, etc.*, 166 N. Y. 92 ; *Parsons* v. *Van Wyck*, 56 App. Div. 329 ; *H. F. S. Assn.* v. *Mayor, etc.*, 99 N. Y. 490 ; *S. P. & P. Assn.* v. *Mayor, etc.*, 152 N. Y. 264 ; *United States* v. *G. Ry. Co.*, 160 U. S. 668 ; *Holtz* v. *Diehl*, 26 Misc. Rep. 229 ; *Matter of Clinton Avenue*, 57 App. Div. 166 ; *Matter of Curran*, 38 App. Div. 82.)

WERNER, J. In 1893 Frederick Booss, the appellant herein, was the owner of certain lands in that part of New York city known as Harlem, having a frontage of about 1,200 feet on

the westerly shore of the Harlem river. In that year the legislature enacted chapter 102, Laws of 1893, entitled "An act to lay out, establish and regulate a public driveway in the city of New York," commonly known as the Speedway Law, directing the department of public parks of the city of New York to lay out and establish a public driveway, not to exceed 150 feet in width, from "a point on One Hundred and Fifty-fifth street in said city, at or near the intersection of said street and St. Nicholas Place, thence in a general northeasterly direction to a point on the westerly shore of the Harlem river; thence in a general northerly direction on, along or near the said west shore of said Harlem river to connect with Dyckman street." Under this act it was made the duty of the counsel to the corporation of the city of New York, upon a written request from said department of public parks "to take the necessary means and proceedings to acquire title on behalf of the mayor, aldermen and commonalty of the city of New York, in and to all such real estate not owned by the mayor, aldermen and commonalty of the city of New York, *or any right, title or interest therein not extinguishable by public authority which shall be embraced within the lines of the driveway as laid out and established by the said department of public parks.*" Said act, as amended by chapter 8, Laws of 1894, and chapter 894, Laws of 1895, further provided that "The said department of public parks shall lay out as part of said driveway one sidewalk, not less than ten or more than thirty feet in width, on each side of said driveway for the convenience of foot passengers, and shall provide for and construct *bridges over or subways under the said driveway so that the same may be crossed otherwise than at grade, but except as to said sidewalks, bridges and subways, no portions of the said driveway shall be used for any other purpose than for riding by equestrians and driving of carriages, and all trucks, carts and vehicles of all kinds for the transportation of merchandise or freight of any description shall be excluded therefrom.* No street or other railway shall be laid down on the said drive or any portion thereof. *In addition*

*to the restrictions herein contained,* the department of public parks may make such other rules and regulations as it may deem advisable for the use of said driveway, and as to the speed of riders and drivers thereon *and as to the exclusion therefrom of any kind of vehicles the use of which may injure said drive-way or render the same unfit or inconvenient for the purposes thereof."*

Pursuant to the directions of said act the said driveway was laid out, established and constructed. It extends along the whole easterly frontage of appellant's lands and, except where his uplands project within the lines of said driveway, it is built upon the "tideway," the title to which is conceded to be in the city of New York. For the taking of the uplands which projected into the line of said driveway due compensation has been made in these proceedings and the only question which arises upon this appeal is whether the appellant is also entitled to compensation for the taking and destruction of his riparian rights in and to the Harlem river, upon which his lands abutted before the construction of said driveway. The question is raised by proper exception to the ruling of the commissioners "that the city is the owner of the tideway and, therefore, they cannot make any award for damages for the loss of riparian rights." The history of the titles to the uplands and the tide-way, respectively, in that part of Manhattan island known as Harlem, and of the law applicable to the same, is so succinctly and clearly set forth in *Sage v. Mayor, etc., of N. Y.* (154 N. Y. 70), that it will be unnecessary to refer to, or discuss at length, the ancient authorities upon the subjects of governmental jurisdiction and control over tideways and tidewaters and the riparian rights of the owners of uplands abutting upon the same. Appellant's title is derived from the Harlem patentees under the patent of Governor Richard Nicolls, dated October 11th, 1667, and the confirmatory patent of Governor Thomas Don-gan, dated March 7th, 1686. The easterly boundary of the lands described in these grants was the Harlem river and under the established law of this state the title of the upland owners ended at highwater mark. (*Sage v. Mayor, etc., of N. Y.,*

*supra.*) The title of the city of New York in and to the "tide-way" around the island of Manhattan is derived from the patent granted by Governor Dongan to said city bearing date April 22nd, 1686, and is fortified by various subsequent confirmatory grants and constitutional and legislative enactments. (*Sage* v. *Mayor, etc., of N. Y., supra.*) By section 14 of the Dongan patent to the city it was provided that the grantees may " at any time or times hereafter, when it to them shall seem fit and convenient, take in, fill and make up and lay out all and singular the lands and grants in and about the said City and Island Manhattan's, and *the same to build upon or make use of in any other manner or way as to them shall seem fit, as far into the rivers thereof, or that encompass the same as far as low-water mark aforesaid.*" It is upon this broad provision of said patent that the city of New York bases its claim of right to construct said driveway along the tideway of the Harlem river without compensation to the appellant for the taking and destruction of his riparian rights. In passing upon this claim it is to be remembered that at the time of the Nicolls grant to the " Harlem residents" in 1667, and for nearly twenty years thereafter, the title to the tideway remained in the crown as a public trust, precisely as it had always existed since the adoption of *Magna Charta.* As the grant to the city of the tideway was not made until after the date of the Nicolls patent, under which the appellant claims title, such grants could not limit or extinguish the riparian rights of the grantees under the Nicolls patent or their successors in title.

What were the riparian rights of the grantees under the Nicolls patent? Their title did not extend below high water and they did not own the tideway. But they were, nevertheless, riparian proprietors upon tidewater, with such title, rights and privileges as belong, at common law, to the owners of upland washed by waters the tide whereof ebbs and flows. " They were entitled, as against all except the crown as trustee for the people at large, to certain valuable privileges or easements, including the right of access to the navigable part of the river in front for the purpose of loading and unloading

boats, drawing nets and the like." (*Sage* v. *Mayor, etc., of N. Y. supra.*) In *Van Dolsen* v. *The Mayor* (21 Blatchford, 455) Judge WHEELER, in construing these grants, said: " There is no question but that the grants stopped at high-water mark, and left the right to the soil under water beyond in the crown, subject to the right of the public to the river as a highway over it." (Cites Bract. book 1, chap. XII, 5 ; *Rex* v. *Smith*, 1 Dougl. 441 ; *Commonwealth* v. *Charlestown*, 1 Pick. 180 ; *Martin* v. *Waddell*, 16 Pet. 367.) This highway was a way to this land when the successive grantees took it and when the orator took his lease of it. So far as the defendants could have any right to it or to the soil under it, the original grantor, the crown, had the same right. " The crown after *Magna Charta* could not grant land bounded on a way, and afterwards remove the way, any more than an individual could. The defendants as grantees from and under the crown are limited, as if they had made the grant which the crown made. They could not grant land to a way on land and afterwards remove the way."

What are the reserved rights of the state or municipality as trustee for the public, in and to the tideway and the waters beyond the same ? The city of New York, as successor to the rights of the crown, has " the absolute power to improve the water front for the benefit of navigation, free from any interference by the riparian owner, whose sole right as against the state or its municipal grantee, as trustee for the public, is the pre-emptive right to purchase, in case of a sale, when conferred by statute." (*Sage* v. *Mayor, etc., of N. Y. supra.*) In the case cited it was held that, under this prerogative, the city had the right to improve navigation for the benefit of the general public, by establishing a bulkhead line and building a sea wall in front of the plaintiff's lands, even though it might injuriously affect his private rights. This decision was based upon the broad principle that " the purpose for which the supreme authority holds the title to lands under tidewater is inconsistent with the power to grant any easement or right to those lands that will prevent it, when the necessities of commerce demand,

from 'wharfing out' to deep water, so that vessels can load and unload and the interests of navigation be promoted." The principle was aptly and forcibly stated by Chief Judge ANDREWS in *People* v. *N. Y. & S. I. F. Co.* (68 N. Y. 76) as follows: " The king by virtue of his proprietary interest could grant the soil so that it should become private property, but his grant was subject to the paramount right of the public use of navigable waters which he could neither destroy nor abridge. In every such grant there was an implied reservation of the public right, etc., and so far as it assumed to inter· fere with it or to confer a right to impede or obstruct navigation or to make an exclusive appropriation of the use of navigable waters, the grant was void." The appellant herein, while conceding the right of the state or municipality to make improvements for the benefit of navigation, without compensation to riparian proprietors for invasion of their private rights, contends that the construction of a " speedway," from which are excluded all forms of commercial traffic or intercourse, is not an exercise of that right, and that, therefore, his riparian rights cannot be taken or destroyed without due compensation. In considering this question let us first dispose of respondent's claim that under section 14 of the Dongan patent the city of New York acquired the right to build upon or make use of the lands in the tideway in any manner or way " as to them shall seem fit." Assuming for the purposes of this discussion that the language of this patent is broad enough to justify the use of the lands in the tideway for any and every public purpose, whether related to the subject of navigation or not, we think it is clear that the appellant's rights are not affected thereby. As we have seen, the appellant's title has its source in the Nicolls patent of 1667. The city's title to the tideway was not acquired until 1686 when the Dongan grant was made. The rights of the grantees under the earlier patent, of course, antedated those created by the later one and thus all questions in this proceeding must relate back to the granting of the Nicolls patent. When that instrument was executed, the

grantees therein named, by acquiring title to the uplands bordering upon the Harlem river, became vested with the common-law rights of riparian proprietors.   By the devolution of title under which the appellant became seized of the uplands, he also became possessed of the riparian rights which passed to the grantees under the Nicolls patent so that, as against him, the language of the Dongan patent of 1686, however broad, gives the city of New York no rights which it would not have had under a simple conveyance in fee.   But even if the grant to the city were of prior or the same date with the grant to the Harlem residents, the right of the former to the use of the tideway was limited by the trust which passed with the title.   The limitations of this trust were not inconsistent with absolute ownership, for at common law a trustee of lands always held the legal title.   The relative rights of the parties under the common law may, therefore, be restated as follows:  The owner of uplands abutting upon a navigable river where the tide flows and ebbs, takes title only to high-water mark.   While he does not own the tideway, or the lands under water beyond the same, he has the easement of passage and the transportation of merchandise, to and fro, between the navigable water and his land; to fish and draw nets; to land boats and to load and unload the same.   These privileges are absolute property rights as against all but the state.   The state holds the title in fee in the tideway and to the lands under water beyond the same, as trustees for the public in its organized capacity.   As such trustee and in the exercise of its governmental functions it may improve the tideway or the adjacent waters for the benefit of navigation, even to the detriment of abutting upland owners and without compensation to them.   As stated in *Sage* v. *Mayor, etc., of N. Y. (supra)*, this rule is based upon the principle that " when any public authority conveys land bounded by tidewater, it is impliedly subject to those paramount uses to which the government, as trustee for the public, may be called upon to apply the water front for the promotion of commerce and the general welfare."

Does this principle of implied or reserved power extend to any public use of the tideway or the waters beyond the same for purposes not related to, or connected with, navigation and commerce? The basis of the theory upon which the trusteeship of the state in our tideways and tidewaters is founded seems to be that there are certain rights of navigation and commerce by water which are common to all and are, therefore, paramount to the rights of individuals. As was said in the *Staten Island Ferry Case* (68 N. Y. 77): "The sea and the navigable rivers are natural highways, and any obstruction of the common right or exclusive appropriation of their use is injurious to commerce, and if permitted at the will of the sovereign would very likely end in crippling if not destroying it." Therefore the state, which is the public in concrete form, is charged with the duties and vested with the powers essential to the establishment and preservation of these common rights. The very implication of the trust upon which the state holds the tideway and tidewaters speaks of the definite purpose for which it was created. If the state may use the waterways for any purpose whatsoever, then it is no longer a trustee, but an irresponsible autocrat. If it may erect upon our tideways or tidewaters any kind of structure that may be suggested by the whim or caprice of those who happen to be in power, it will be possible to destroy navigation and commerce by the very means designed for their preservation and improvement. Discussion of this question seems almost superfluous in view of the definite and conclusive construction given to the grants herein referred to in *Sage* v. *Mayor, etc. of N. Y. (supra)*. The opinion in that case not only defines the extent, but also suggests the limitations of the powers of the state over its tideways and tidewaters. If the trusteeship of the state in the tideway exists only for the purposes above enumerated, it would seem to follow that when, in the exercise of its general right of eminent domain, the state appropriates the tidewater to uses inconsistent with the trust upon which it is held, that, is, to some use not for the benefit of navigation, compensa-

tion should be made to the riparian proprietor whose rights have been abridged or taken away. Any other conclusion would necessarily admit the arbitrary and unlimited powers of the state over its tideways and tidewaters for any and every purpose, whether connected with the subject of navigation or not; and no such admission should find its way into our laws. In *Bedlow* v. *N. Y. Floating Dry Dock Co.* (112 N. Y. 273) the late Chief Judge RUGER in referring to the scope and effect of the Dongan and Montgomerie grants said: " These grants were obviously made to extend municipal control over said lands and enable the city to regulate the erection of necessary structures upon the land under water around the island, with a view of promoting facilities for the growing commerce and trade of the port of New York, and to regulate and preserve the rights of riparian owners in such lands and the navigable waters covering them. \* \* \* It has sometimes been said that the ownership of the fee in such lands gave the city, as matter of legal right, authority to erect and build such structures thereon as they saw fit to make. We are inclined to think that this proposition to its full extent cannot be maintained. The right of control over navigable waters of the state is a legislative power and cannot be destroyed by any authority whatsoever. The right of the people to use the natural public highways is *jus publicum* and cannot be taken away or seriously impaired."

Let us now examine somewhat more carefully into the character of the structure erected upon the western tideway of the Harlem river and its effect upon the adjacent uplands. The act under which it was laid out and constructed specifically limits its use to the pursuit of pleasure in driving, riding or walking. All forms of commercial traffic are rigidly excluded therefrom. It consists of an embankment about one hundred and fifty feet wide and from five to eight feet in height above the tideway. It can be crossed only by means of subways or overhead bridges, the use of which is confined to pedestrians. The uplands west of the same are as completely cut off from

10

the use of the river as they would be if the city had erected upon its bank a "Chinese wall" instead of a "speedway." The owners of these uplands are deprived not only of those private rights which inhere in their ownership, but of those privileges which, as a part of the public, they enjoyed in common with the rest of the public. The Harlem river as a public highway was open to them, not alone as a means of getting to and from their own lands, but for all the purposes of traffic and communication to which such an artery of commerce may be devoted. Now it can be used by them for neither purpose. If these changed conditions are the result of improvements to general navigation, then, as we have seen, the injured upland owner is remediless, for it was simply the exercise by the state of its reserved and paramount power over its tideways and tidewaters. If, on the other hand, such changes are created by the state or municipality, not as trustee for the people of the tideways and tidewaters, not for any improvement of navigable waters or any matter connected therewith, but by the building of a public work which, in its whole length and breadth, is utterly destructive of navigation and commerce, then it would seem to follow that the persons whose property has been taken, or whose easements have been destroyed thereby, are entitled to compensation under the constitutional guaranty that no private property shall be taken for public use without just compensation. The case of *Duke of Buccleuch* v. *Metropolitan Board of Works* (L. R. [5 E. & I. App.] 418) is quite in point upon the facts before us, although held not to be an authority upon the precise question which was decided in the *Sage* case. The Duke of Buccleuch was the occupant under a lease from the crown of a manor house, the garden of which ran down to the River Thames. There was a causeway running from the garden to low-water mark. Under the "Thames Embankment Act," passed in 1862, an embankment was built along the river and a road constructed between it and the garden. In an action brought for damages it was held that the loss of the river frontage was an item to be considered in determining the

depreciation in value of the property. As stated by Judge VANN in the *Sage* case the recovery in the *Buccleuch* case was based primarily upon the terms of the " Thames Embankment Act." But Mr. Baron CLEASBY, one of the law lords who sat in the case, was of the opinion that " the deprivation of the water right is clearly an injurious affecting of the premises to which it is annexed within the proper meaning of that term. It would be an actionable wrong at the suit of the owner unless justified by special acts, and it is unnecessary to rely upon the act (Thames Embankment Act) which recognizes the right to compensation for loss of river frontage." The analogy of this case to the *Buccleuch* case is made complete by the terms of the statute (Chap. 102, L. 1893) under which the counsel to the corporation of the city of New York is directed to institute proceedings to acquire title on behalf of the mayor, commonalty, etc., in and to all real estate not owned by the city, " *or any right, title or interest therein not extinguishable by public authority,* which shall be embraced within the lines of the driveway * * * and, except as provided in this act, all provisions of law relating to the taking of private property for public streets or places in said city are hereby made applicable so far as the same may be necessary for the acquiring of any *land, property rights, terms, easements and privileges* which it shall be necessary to acquire for the purposes of this act." The Harlem river is no less a highway than any of the public streets of New York city. It is the settled law of this state that the owners of lands abutting upon such streets have easements therein which are property rights and cannot be destroyed or abridged for a public use without compensation. (*Story* v. *N. Y. E. R. R. Co.*, 90 N. Y. 168.) In that case Judge TRACY said, " to constitute a taking it is sufficient that the owner claiming compensation has some right or privilege secured by grant in the property appropriated to public use, which right or privilege is destroyed, injured or abridged by such appropriation." In the case of *Smith* v. *City of Rochester* (92 N. Y. 464), which arose out of defendant's diversion of the waters of

Hemlock lake to supply its residents with water for domestic purposes, this court held that the public has an easement in such waters for the purposes of travel, as on a highway, and as such easement pertains to the sovereignty of the state, it is inalienable and gives the state the right to use, regulate and control such waters for the purposes of navigation. It was also held that " the right to divert the water for other uses, although public in their nature, can only be acquired under and by virtue of the sovereign right of eminent domain and upon making just compensation." In *Barney* v. *Keokuk* (94 U. S. 324) it was held that the city had no right to authorize the erection of a railroad depot on the water line of a marginal street so as to cut off the plaintiff's riparian rights, without his consent and without compensation, although it might build wharves and levees on the bank of the river below high-water mark or authorize the erection of a packet depot as a necessary adjunct to a steamboat landing, or do anything else that was necessary to navigation without such consent and compensation. It is unnecessary to inquire whether the appellant would be entitled to compensation for loss of his riparian easements if the municipality had laid out and constructed in the tideway a general street open to commercial traffic. It is enough to say that no such street was laid out and constructed. Nor are we concerned with the extent of appellant's alleged loss. It is, undoubtedly, the fact that before the construction of this driveway the appellant's riparian rights were of a very limited character. At high tide the tideway was covered with shallow water which only afforded passage for small boats of light draught; at low tide it was a mud bank which interdicted communication between the river and the uplands. It may even be, as suggested, that the appellant's lands are more valuable now than they were before the construction of the " speedway." However that may be, the fact remains that the question whether the appellant has been injured by the taking of his riparian easements and the extent of his injuries, if any, has never been passed upon. He was entitled to have that question decided, and the refusal of the commis-

sioners to consider it was error for which the order of the court below should be reversed.

The order of the Appellate Division should be reversed, with costs to the appellant, and this proceeding remitted to the Special Term with directions to proceed thereon according to law.

BARTLETT, VANN, LANDON and CULLEN, JJ., concur; PARKER, Ch. J., and HAIGHT, J., dissent and vote for affirmance for the reasons stated in the opinion of the Appellate Division.

Ordered accordingly.