In the Matter of the Application of the CITY OF NEW YORK, Relative to Acquiring Title, etc., to the Lands, Tenements and Hereditaments Required for the Opening and Extending of Inwood Hill Park, in the Borough of Manhattan, City of New York, etc.

CITY OF NEW YORK, Appellant; EMPIRE MORTGAGE COMPANY and Others, Respondents.

First Department, February 18, 1927.

**Municipal corporations — proceedings by city of New York to condemn land under water between high-water line and Federal bulkhead line of Hudson river — land was granted to city by State — land has been condemned for park purposes — city has power, under Greater New York Charter, § 970, to condemn said land for park purposes — § 71 of charter does not prevent condemnation — city is entitled to full compensation — value of land taken may be assessed against adjoining property.**

This is a proceeding by the city of New York to condemn land under water between the high-water line and the Federal bulkhead line of the Hudson river. The land in question was granted to the city by the State and is now sought to be condemned by the city for park purposes. The city has the right, under section 970 of the Greater New York Charter, to condemn the land for park purposes, and it is not prevented from doing so by section 71 of the charter, providing that land under water shall be inalienable.

The city is entitled to full compensation for the land taken, and it has the right to have the value thereof assessed against adjoining property in the boroughs of Manhattan and The Bronx, in accordance with a resolution of the board of estimate providing for an apportionment of the assessment.

REARGUMENT of an appeal by the City of New York from that part or portion of the last partial and separate final decree of the Supreme Court, entered in the office of the clerk of the county of New York on the 10th day of January, 1924, pursuant to section 1003 of the Greater New York Charter (Laws of 1901, chap. 466, as added by Laws of 1915, chap. 606),* rendered after a trial at the New York Special Term in condemnation proceedings, which eliminates from the proceeding the land under water situate between the mean high-water mark and the United States bulkhead line of the Hudson river owned by the city of New York, and known as damage parcels Nos. 42 and 43, and also from said decree in so far as it contains no awards for the aforesaid land under water, and in so far as the court failed to make any award for the acquisition of title to the aforesaid land under water, and in so far as said decree relates to and affects the aforesaid land under water. (217 App. Div. 587.)

---

* Since amd. by Laws of 1925, chap. 635.— [REP.

*L. Howell LaMotte* of counsel [*Joel J. Squier* with him on the brief; *George P. Nicholson, Corporation Counsel*], for the appellant.

*Martin Conboy* of counsel [*Harry B. Chambers* and *Philip S. Hill* with him on the brief; *Griggs, Baldwin & Baldwin,* attorneys], for the respondents Frank M. Van Wagonen and others.

*Franklin Grady* of counsel [*Henry deForest Baldwin* with him on the brief; *Lord, Day & Lord,* attorneys], for the respondent Empire Mortgage Company.

MARTIN, J.   A reargument of this appeal became necessary because of the objection taken by the appellant to one of the justices taking part in the decision, who had been corporation counsel, and as such, attorney for the city, during the time this proceeding was pending in the courts.

In 1916 the board of estimate and apportionment, pursuant to the Greater New York Charter, decided it was for the public interest that the title to certain real property be acquired for the opening and extending of Inwood Hill Park, in the city of New York, as laid out on the city map in accordance with a resolution which had been previously adopted by the said board and approved by the mayor.   The property which that board deemed it was to the public interest to acquire for such public purposes was fully described therein.   It included lands under water owned by the city of New York, known herein as damage parcels Nos. 42 and 43, which are the subject of this controversy.

A question has arisen whether the municipality may condemn for park purposes property under water between the mean high-water line and the Federal bulkhead line of the Hudson river and whether the value of same, as fixed in the condemnation proceeding, may be made part of the total amount to be assessed on adjoining property in the boroughs of Manhattan and The Bronx in accordance with the resolution of the board of estimate providing for the apportionment of the assessment.   That resolution provided that five per cent should be assessed upon a certain primary area of benefit; forty-five per cent on a second area of benefit; forty-five per cent upon the borough of Manhattan, and five per cent upon the borough of The Bronx.

In accordance with the resolutions referred to and others adopted at the same time and subsequently, the corporation counsel instituted the necessary proceedings and the matter progressed in the Supreme Court and a further resolution vesting title was adopted by the board of estimate and apportionment in 1917.

It appears that the court first allowed the city of New York $251,707.26 for damage parcel No. 42 and allowed $8,054.20 for

damage parcel No. 43. For damage parcel No. 42, the land under the Hudson river between the high-water line and the United States bulkhead line, the court allowed at the rate of $1,000 per city lot, and for parcel No. 43, the land under the Harlem river ship canal between the high-water line and the United States bulkhead line, the court allowed at the rate of $250 per city lot.

Subsequently, however, the awards to the city were eliminated and assessments were reduced accordingly, objections having been filed in due course by various owners of property assessed. The objectors contended that there was no authority in law for taking city property for park purposes; and that, in no event, should awards be made to the municipality for the property as it had been ceded to the city subject to certain conditions, it being asserted that it could not be sold or taken for any purpose. However, its value for park uses is as great as if the city could sell it and give an absolute fee.

It was also urged by some of those opposing the assessment that the awards for said lands under water were made by this court without an opportunity to be heard as to the value thereof.

Although the city contended that these objections were unfounded, nevertheless, it recalled the only witness who testified for it as to values and consented that any one aggrieved might cross-examine him, and also consented that those assessed be given an opportunity to produce evidence as to values. The owners failed to avail themselves of these opportunities.

The court, however, sustained their objections upon the ground that the city had no authority to acquire, in this or any other proceeding, for park purposes, the land under water.

There appears to be no doubt but that the city of New York may take its property for public purposes, receive compensation therefor and have the same assessed against the property benefited. (*Matter of Mayor of New York — Fordham Road,* 74 App. Div. 343; appeal dismissed, 172 N. Y. 653; *Matter of Ninth Avenue & 15th Street,* 45 id. 729, 733.)

The city of New York contends that as a proprietor and owner of land it is to be paid for the land the same as any other proprietor. (*Matter of Ninth Avenue & 15th Street, supra.*)

The property could be sold to individuals subject to the limitations in the grant to the city and subject to the charter provisions.

In *Langdon v. Mayor* (93 N. Y. 129, 134) the court said: " Under the Dongan charter,* in 1686, the crown of England granted to the city of New York all the land between high and low-water mark around the island of Manhattan, with jurisdiction over the same, and with power ' to take in, fill, and make up and lay out all and

---

* See §§ 4, 14.— [REP.

singular the lands and grounds in and about said city and island Manhattan, and the same to build upon, or make use of in any other manner or way as to them shall seem fit, as far into the rivers thereof and that encompass the same as low-water mark aforesaid; ' and in 1730, by the Montgomerie charter,* it further granted a strip of land four hundred feet in width, lying immediately outside of low-water mark, and extending from Corlear's Hook, on the East river, around the southern extremity of the island to Bestaver's rivulet (excepting, however, the space in front of the Battery), with full power and authority at any time thereafter ' to fill, make up, wharf, and lay out all and every part thereof,' and to take the wharfage, cranage and dockage arising or accruing therefrom.  It was, however, provided in the grant that nothing therein contained should empower or entitle the city to wharf out before any persons who had prior wharf grants beyond low-water mark, without the actual agreement or consent of such persons, and that of the wharves to be built or run out by the city, there should be left toward the East and North rivers, forty feet broad for the convenience of trade and the planting of batteries in case of necessity.

" Under these charters, the city at an early day made many grants, to private persons, of lands under water, with the right to make wharves and take the wharfage accruing therefrom, and such grants extended out into the rivers to unequal distances within the limits of ownership by the city.  *  *  *

" We think it equally clear that whatever title and property rights the city thus obtained, it could transfer and convey to individuals.  *  *  *

" From the earliest times in England the law has vested the title to, and the control over, the navigable waters therein, in the crown and Parliament.  A distinction was taken between the mere ownership of the soil under water and the control over it for public purposes.  The ownership of the soil, analogous to the ownership of dry land, was regarded as *jus privatum,* and was vested in the crown.  But the right to use and control both the land and water was deemed a *jus publicum,* and was vested in Parliament. The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by Parliament.  *  *  *

" So in this country each State (subject to limitations to be found

* See §§ 37, 38.— [REP.

31

in the Federal Constitution) has the absolute control of all the navigable waters within its limits. As said by the chancellor in *Lansing* v. *Smith* (4 Wend. 9), the State through its Legislature ' may exercise the same powers which previous to the Revolution could have been exercised by the King alone, or by him in conjunction with Parliament, subject only to those restrictions which have been imposed by the Constitution of the State · and the United States.' "

The city has an absolute right to improve its water front property or to use it for any public purpose.

The State had title and power to dispose of these lands and it could permit the city to do likewise.

In *People* v. *Steeplechase Park Co.* (218 N. Y. 459, 473) the court said: " In this country the State has succeeded to all the rights of both crown and Parliament in the navigable waters and the soil under them, and here the *jus privatum* and the *jus publicum* are both vested in the State."

In *Towle* v. *Remsen* (70 N. Y. 303, 308) the court said: " The land under water originally belonged to the crown of Great Britain, and passed by the Revolution to the State of New York. The portion between high and low water mark, known as the *tideway*, was granted to the city by the early charters (Dongan charter, §§ 3 and 14; Montgomerie charter, §§ 37), and the corporation have an absolute fee in the same."

In *Knickerbocker Ice Co.* v. *Shultz* (116 N. Y. 382, 387) the court said: " Through the medium of the Legislature, the State may exercise all the powers which previous to the Revolution could have been exercised either by the King alone or by him in conjunction with his Parliament, subject only to those restrictions which have been imposed by the Constitution of this State or of the United States."

In *Matter of Long Sault Development Co.* (212 N. Y. 1, 8) the court said: " The power of the Legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment has been exercised too long and has been affirmed by this court too often to be open to serious question at this late day. (*Lansing* v. *Smith,* 4 Wend. 9.) "

Grants by the State to the owners of the adjoining upland for beneficial enjoyment or commercial ' purposes have long been authorized and recognized as lawful.

In *Matter of City of New York — Speedway* (168 N. Y. 134, 141) the court said: " The City of New York, as successor to the rights of the crown, has ' the absolute power to improve the water front for the benefit of navigation, free from any inter-

ference by the riparian owner, whose sole right as against the State or its municipal grantee, as trustee for the public, is the pre-emptive right to purchase, in case of a sale, when conferred by statute.' "

In *Matter of Commissioner of Public Works — Harlem River* (135 App. Div. 561, 579) the court said: " I have reached the conclusion that while the title to the land under water, which was vested in the city by the act of 1852, was not divested by the act of 1868,* that, being upon a navigable stream, it was held for the same public trusts that it had been held prior to the act of 1852 by the State in the public interests. The nature of this title, both in the State and as conferred by it upon the city, is set forth in *Matter of City of New York* (168 N. Y. 134), the *Speedway* case, with a full citation of authorities. When the State authorized the proprietors of the water grants, in the interests of navigation and commerce, to erect piers and dig out slips, and when the city, by its dock department, granted its permission, and when, acting under such authority and permission, Ingraham built the pier and dug out the slip, expending his money therefor, I think he acquired property rights which could not be taken from him without due compensation. Whether this permit from the dock department should be considered a revocable license because of the provision therein contained, ' subject to any alterations which the Department of Docks may by law be empowered to make in said district,' or not, it seems sufficient to say that the department of docks has made no such alteration in said district, and has not revoked said license by any act done by it.

" This property is being taken by authority of law for an entirely different purpose, to wit, for the foundations and bridge across the river, and is in no sense an aid to the navigation thereof, but an obstacle thereto, even if it be a drawbridge, and the law which authorized it and the petition which instituted the proceedings provided for the acquiring of title to the lands and premises, rights and easements required.

" A valuable right which has been in existence since the year 1871 is being destroyed for the purpose of a public improvement. Mere easements of the light, air and access in the public streets have been held in innumerable cases in this State to be property rights and for the destruction thereof the courts have compelled the payment of vast sums of money."

The State may delegate the power to take such land to its agent, the municipality. It has delegated such power to the city of

---

* See Laws of 1852, chap. 285; Laws of 1868, chap. 150.— [REP.

New York, and the city is authorized, in our opinion, to take these lands for park purposes. (Greater N. Y. Charter, § 970, as added by Laws of 1915, chap. 606; since amd. by Laws of 1917, chap. 631, and Laws of 1922, chap. 563; *Matter of Mayor of New York — Fordham Road, supra; Matter of Mayor — Van Cortlandt Avenue,* 186 N. Y. 237.)

In *Matter of Mayor of New York — Fordham Road (supra)* the city condemned wharf property extending into the Harlem river between high-water mark and the bulkhead line, as established by the United States government in 1890. It was there held that the municipality had a right to acquire the property for street purposes. In fixing value it was said that the commissioners were to take into consideration the location and the improvements, as well as present and prospective earning capacity, in view of the uses to which the property might be put. The city had the same title there that it has to the lands under water taken in this proceeding. Its lands under the waters surrounding Manhattan Island within the United States bulkhead line, subject to the riparian rights of upland owners, have a substantial value. (*Sage* v. *Mayor,* 154 N. Y. 61; *Matter of City of New York,* 217 id. 1.)

In no case should an award be made for less than the value of the property actually taken by condemnation. (*Matter of City of New York,* 190 N. Y. 350; 168 id. 134.) The city is entitled to compensation for its loss and damage in like manner as other owners. (Greater N. Y. Charter, § 978, as added by Laws of 1915, chap. 606; *Matter of Ninth Avenue & 15th Street, supra; Matter of Mayor — Van Cortlandt Avenue, supra.*) Otherwise the property of the people surrounding this park will be enhanced in value at the expense of the rest of the taxpayers of the city of New York, and without just compensation being granted to the city. (See U. S. Const. 14th Amendt. § 1; State Const. art. 1, § 6.)

Although section 71 of the Greater New York Charter (Laws of 1901, chap. 466) provides against the city's selling certain property, it does not prevent the condemnation of property when needed for a public use. This is not a disposition inhibited by the statute; for power is expressly given to condemn property for such a use. (Greater N. Y. Charter, § 970; *Matter of Ninth Avenue & 15th Street, supra.*)

The purpose of said section 71 is to render water front and wharf property, ferries, land under water, public landings, wharves, docks, streets, avenues, parks and all other public places inalienable. If it prevented the condemnation of property, all such properties would be beyond the reach of the public authorities, however necessary it might be to devote them to public uses. The

statute was never intended to have this effect. The city has frequently condemned such property.

When this statute was invoked in the recent case of *City of New York* v. *D., L. & W. R. R. Co.* (206 App. Div. 228) it was here said: " The appellant attacks the agreement of December 4, 1903, between the city of New York and Carroll, defendant's predecessor in title, upon the ground that it is *ultra vires* and in contravention of the provisions of section 71 of the Greater New York charter. Section 71 reads as follows: ' The rights of the city in and to its water front, ferries, wharf property, land under water, public landings, wharves, docks, streets, avenues, parks, and all other public places are hereby declared to be inalienable.' (Laws of 1901, chap. 466, § 71.) I do not think the agreement between the city and Carroll contravenes the charter provision above quoted, when read in connection with other charter provisions hereinafter mentioned. I am of the opinion that the agreement of December 4, 1903, was in all respects valid and binding upon the parties."

In the same case the Court of Appeals (237 N. Y. 398), in passing on section 71 of the charter, said: " The statute invoked in support of this conclusion is section 71 of the charter of the city of New York * * *. We have no thought to whittle down by artificial or nice construction this comprehensive declaration. On the other hand, in giving effect to it, we are not at liberty to disregard exceptions, if any, established by other sections of the charter, which equally with this one are to be respected and obeyed."

Assuming that it has a right to condemn the property, the city should receive compensation therefor. It might be leased, for example, to be used for dock purposes, and a large revenue result. This possible source of revenue is lost when the land is used exclusively in connection with a park. It might be utilized for many purposes if not taken for a park. Its value should not be, in part at least, transferred to the surrounding property without compensating the city.

To the suggestion that the park would have the same outlook and rights over the water front if the city's property had not been taken, the answer is that, if it were not taken for park purposes, the municipality might lease for dock or other purposes or otherwise dispose of it subject to the limitations of the grant of same from the State or charter provisions, which charter provisions may at any time be repealed.

We are, therefore, of the opinion that the final decree should be reversed, with costs and disbursements to the appellant; that damage parcels Nos. 42 and 43 should be included in the proceeding, and the proceeding remitted to the court at Special Term to

make awards to the city of New York for said damage parcels, with costs.

Dowling, P. J., Finch, McAvoy and O'Malley, JJ., concur.

Final decree reversed, with costs and disbursements to the appellant; damage parcels Nos. 42 and 43 included in the proceeding, and proceeding remitted to the court at Special Term to make awards to the city for said damage parcels, with costs.