In the Matter of the Application of THE CITY OF NEW YORK, Relative to Acquiring Title Wherever the Same Has Not Been Heretofore Acquired for the Same Purpose in Fee to the Land and Lands under Water Within the Site on Ward's Island Laid Out for a Sewage Treatment Plant, Excepting Any Land, Easements and Rights Held by the EAST RIVER GAS COMPANY or by the NEW YORK CONNECTING RAILROAD COMPANY as Shown upon a Map Adopted by the Board of Estimate and Apportionment on April 18, 1929, in the Borough of Manhattan, City of New York.

Supreme Court, Special Term, New York County, January 3, 1936.

*Paul Windels, Corporation Counsel* [*Charles Bisberg* and *Edward Weingarten* of counsel], for the City of New York.

*Josiah A. Stover*, for the claimants.

McLaughlin (Charles B.), J. This is a condemnation proceeding for the purpose of acquiring land wholly under water and in separate ownership from the abutting upland, all of which is owned in fee simple absolute by the city of New York. The *locus* is Ward's island, formerly called Great Barn island.

In 1806 five persons became the owners of the upland of this island. In 1807, at the request of these five owners, this island was surveyed by a surveyor named William Bridges. He laid it out in seventy-seven lots, all abutting on four different roads, and fifty-two of them abutted on the waters of the Harlem and East rivers, and Little Hell Gate and Great Hell Gate. In the following year these parties by deed conveyed specific lots to each of them individually. In 1811 the owners of the lots conveyed to them by this deed received from the Commissioners of the Land Office a grant or patent conveying to them in fee " all the lands under water around Great Barn Island situated in the East River or Sound in the City and County of New York from high water mark to low water mark and extending on the northwest side of said island 150 feet from low water mark towards New York Island, and from the other parts of said Island 300 feet from low water mark, together with all and singular the rights, hereditaments and appurtenances, to have and to hold unto said parties in fee."

Some of this land under water is being acquired in this proceeding. It may be also stated that the city of New York has long since become the owner of all of the upland on Ward's island adjacent

to or abutting the lots under water which are the subject-matter here. In 1858 one Alfred E. Beach acquired title to some of the lands under water. In 1868 he brought an action for partition of the land under water, and among the ninety-five defendants in that action were the mayor, aldermen and commonalty of the city of New York and the Commissioner of Immigration. He was successful and in 1872 an interlocutory decree was entered appointing commissioners and directing them to prepare a survey showing Ward's island as laid out into lots upon the Bridges map, and the lands under water as set forth and granted by the terms of the patent or grant heretofore referred to. A surveyor named Rudolph Rosa prepared such map and it was adopted in 1876. The opinion of the court is found in *Beach* v. *Mayor* (45 How. Pr. 357). The interlocutory judgment adjudicated the interests of those who then owned the land under water and stated that those interests covered in each instance an " interest in the lands and lands under water and water rights." The final judgment in this action distributed the lots under water to these parties, with the result that each owner obtained a specific number of lots in lieu of an undivided interest in all the said land under water. The recital of these facts is necessary to a proper consideration of the points raised upon this trial.

The first question presented is whether the lands under water are subject to the riparian rights of the upland owner. In determining this proposition we find that in 1806, when the five original owners acquired title to this island, they first became the owners of the upland. As such they acquired the easement over the lands between high and low water in order to reach deep water. That right was then in them as owners of the shore. It remained in them as long as they owned the shore. (*Yates* v. *Milwaukee*, 10 Wall. 497; *Rumsey* v. *N. Y., N. E. R. R. Co.*, 133 N. Y. 79.) At the time mentioned the State of New York owned the land under water extending to the high-water mark. That title was burdened with the easement of the upland owners. The State of New York could only grant the land under water, burdened with that easement. This the State did by granting in common, so that while the tenancy in common had been severed and discontinued as to the upland, such tenancy in common was continued as to the land under water. However, in the course of time title in fee to all the upland opposite these parcels under water passed to the city of New York, formerly called the mayor, aldermen and commonalty. The deeds to the city to all this upland carried with them riparian rights. It is well settled in this State that the owner of the upland has always the right to pass along and over the water adjacent to

his property. Lots under water may not be filled in or used in any way to deprive the owner of the upland from exercising his riparian rights. (*Tiffany* v. *Town of Oyster Bay*, 234 N. Y. 15, 23; *Gucker* v. *Town of Huntington*, 268 id. 43; *Hinkley* v. *State*, 234 id. 309, 315.)

The claimant contends that while ordinarily there might be an easement, there is none in this instance by reason of the decree in partition in the action of *Beach* v. *Mayor* (*supra*). It is, indeed, a case that appears to be *sui generis*. The owner of an undivided interest in the land under water sued to partition such land and made the mayor, aldermen, etc., parties defendant. This court can find nothing in the record in that action which destroys or takes away from the city its riparian rights. The action did not concern the upland. The claimant talks of the " water rights " mentioned in the judgment and decision, but there was no mention of any riparian rights.

INGRAHAM, J., said: " It may admit of some question whether the intermediate conveyances, [he undoubtedly meant of the upland and shore] after the patent [he undoubtedly meant the grant of land under water] from the State was obtained, conveyed the land under water by the term water rights and water privileges, of, in or pertaining to the island. * * * I am of the opinion that the words here used, water rights and water privileges, with the terms hereditaments and appurtenances are sufficient to include the land under water."

That is a decision that all the water rights passed with the implied grant of the land under water. His following words give an opportunity for raising a point, which the claimant seizes. " There are no water rights except under the patent, and no water privileges except by filling to change the land under water to upland." The claimant urges that those words destroyed the easement over the land between high- and low-water mark, and that as the city was a party and the present owners' predecessors mere parties, it is (right or wrong) *res adjudicata*.

It would certainly be a remarkable thing if such a learned judge stated that an upland owner has no easement from his upland shore to navigable water. He did not say it; nor did he hold it. What then did he mean? An examination shows, however, that the land under water being partitioned consisted of two strips all around the island, an inside strip between high and low water, and a strip varying from 150 to 300 feet outside of that. The strip between high and low water was of little use. At low tide it was dry; at high tide it was covered. It could only be kept either wet by dredging or dry by fill or dike. It would appear that INGRAHAM, J., was talking about the outside strip. The fact that he did not

mention dredging so indicates, for that is an obvious way of reaching navigable water. His statement that fill is the only way to use the land under water indicates he was speaking of land where only fill could be used, for obviously dikes would also change the character of the tidal strip. The contention based on *res adjudicata* is overruled.

The claimant asserts that the allotment fixed in the partition action negatives the claim that riparian rights now exist. That position is based upon the assertion that if the easements are preserved, the distribution is patently inequitable. The subject-matter of the action was the land under water and not the upland. As between the owners of the land under water, the court did equity. As between the upland owners, there was no attempt to partition or allocate any property. That matter was not before the court. If it had been, the same result was present in 1872 as in 1935, viz., that the land under water, no matter how partitioned or allocated, was subject to the riparian rights of the adjacent owners of the upland, no matter who they were. The conclusion is inevitable that these lands under water are subject to easements. The existence of such easements does not deprive an owner of substantial damages. This means that an owner is to be paid the actual market value of the property. If it has no market value, then the award must be nominal.

The Court of Appeals has held that the riparian rights such as the city has in this case do not exhaust or annihilate the uses to which this property may be put. The claimant is, therefore, entitled in each instance to substantial damages according to the market value as proved in the proceeding. (*Matter of City of New York* [*Main St.*], 216 N. Y. 67, 68.) The Appellate Division, First Department, has also held that such land under water has a substantial value (*Matter of City of New York* [*Inwood Hill Park*], 219 App. Div. 478). This means that the owner is entitled to the value of the property, which is what a purchaser who is not compelled to buy would pay under ordinary conditions to a seller who is not compelled to sell. It is clear from the evidence produced that in its present condition under water, this land has no market value. It is not disputed that, to make the property available for use, it would be necessary to fill in and bulkhead it. The proposed scheme for a bungalow colony must be disregarded as chimerical. It is quite similar to another such proposition which received the condemnation of the Appellate Division. (*Matter of City of New York* [*Inwood Hill Park*], 197 App. Div. 431, 434.) From all the testimony, and also from the view made, together with the court's experience, it is plain that the cost of bulkheading and filling in

this property will be far in excess of any price that a willing purchaser would pay a willing seller. The land, therefore, has no market value as a fact. The awards here are fixed at one dollar each.

Let the corporation counsel prepare a tentative decree accordingly.